F I L E D
United States Court of Appeals
Tenth Circuit

DEC 31 1998

PATRICK FISHER
Clerk

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

vs.

ROBERT ALLEN MARTIN,

    Defendant-Appellant

No. 98-6089

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CR-97-145-L)

William P. Earley, Assistant Federal Public Defender, Oklahoma City, Oklahoma, for Defendant-Appellant.

Timothy W. Ogilvie, Assistant United States Attorney (Patrick M. Ryan, United States Attorney, with him on the brief), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

Before **KELLY**, **HOLLOWAY**, and **LUCERO**, Circuit Judges.

**KELLY**, Circuit Judge.

Defendant-Appellant Robert Allen Martin appeals his conviction of one count of threatening to murder a law enforcement officer whose killing would be a crime under 18 U.S.C. § 1114, with intent to impede, interfere or retaliate

against the officer, while he was engaged in or on account of his official duties, in violation of 18 U.S.C. §115(a)(1)(B). Mr. Martin contends that the district court improperly denied his motion to dismiss because the object of the threat was not a federal officer within the meaning of § 115(a)(1)(B). He also challenges the sufficiency of the evidence and the calculation of his sentence under the Sentencing Guidelines. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

In 1996, detectives from the Enid, Oklahoma Police Department and the Enid office of the FBI launched a cooperative narcotics interdiction effort under the code name "Enid Storm." Detective Sergeant Brian O'Rourke, who headed the narcotics unit of the Enid Police Department, received a special deputation from the FBI that gave him nationwide jurisdiction while working on Enid Storm. The joint law enforcement operation resulted in numerous federal indictments, including those of Danny Bennett and Patrick Gill, two friends of Mr. Martin. After his arrest, Mr. Bennett agreed to cooperate with law enforcement, and, in August 1997, he informed the FBI that Mr. Martin had made several threats against Detective O'Rourke's life. Using a tape recorder provided by the FBI, Mr. Bennett recorded a conversation with Mr. Martin on or about August 30, 1997, in which Mr. Martin threatened to unload six bullets into Detective O'Rourke's brain. During the same conversation, Mr. Martin planned that he and

Mr. Bennett would deny knowing each other after the murder.  See Gov. Ex. 4-A.

A federal grand jury indicted Mr. Martin on three counts of threatening a federal law enforcement officer under 18 U.S.C. § 115(a)(1)(B).  The first two counts stemmed from threats that Mr. Martin allegedly made on or about August 28, 1997 at Mr. Bennett's home and at a Kentucky Fried Chicken restaurant in Enid.  A conversation recorded in Mr. Bennett's home on or about August 30, 1997 provided the basis for the third count.  The district court denied Mr. Martin's motion to dismiss the case because it found that Detective O'Rouke was a federal official within the meaning of § 115(a).

At trial, Mr. Bennett not only testified that Mr. Martin made threats against Detective O'Rourke's life, see 4 R. at 78, 84, 88, 92-95, but also that Mr. Martin asked him to buy ammunition and help "case" the police station.  See id. at 85-86. Mr. Bennett and his common law wife, Tonya Sovine, testified that Mr. Martin showed them three types of weapons around the time that the threats were made: a .38 pistol, see id. at 72, 150; a sawed-off shotgun, see id. at 83, 164; and a .380 semi-automatic weapon that would increase Mr. Martin's firepower in a potential shootout with Detective O'Rourke.  See id. at 108-10.  Several witnesses, including Mr. Bennett's housemate, Mandy Daniels, and the defendant's mother, Mary Martin, confirmed that Mr. Martin owned a .380 semi-automatic gun but had misplaced the clip.  See id. at 173-74; 5 R. at 244-45.

The jury convicted Mr. Martin of the third count, the threat documented on tape, and acquitted him of the other two. At sentencing, the court calculated a total offense level of twenty-one, given a base offense level of twelve, see U.S.S.G. § 2A6.1, with a six-level increase for conduct evidencing intent to carry out his threats and a three-level victim-related increase for threatening a law enforcement officer who was assisting the FBI.

## A. Denial of Motion to Dismiss

In determining whether a local police detective deputized to participate in federal narcotics investigation is a federal officer within the meaning of 18 U.S.C. § 115(a)(1)(B), we encounter an issue of first impression. 18 U.S.C. § 115(a)(1)(B) makes it a crime to "threaten[] to . . . murder . . . a Federal law enforcement officer, or an official whose killing would be a crime under [18 U.S.C. § 1114]." 18 U.S.C. § 1114 provides for the punishment of

> [w]hoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government . . . while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance.

The meaning of an "officer or employee of the United States" or a "person assisting such an officer" under §1114 thus lies at the heart of this case.

We review the district court's interpretation of a statute de novo. See Southern Ute Indian Tribe v. Amoco Prod. Co., 151 F.3d 1251, 1256 (10th Cir.

- 4 -

1998) (en banc). Yet, while the type of individual encompassed by § 1114 is a legal question for the court, the jury must decide the ultimate issue of fact – whether Detective O'Rourke was engaged in the performance of federal duties. See United States v. Bettelyoun, 16 F.3d 850, 853 (8th Cir. 1994).

Mr. Martin argues that a local police detective does not become a federal law enforcement officer merely because he has been deputized to assist an FBI investigation and that, consequently, the district court lacked jurisdiction. According to Mr. Martin, Detective O'Rourke's authority to aid the FBI derived from 21 U.S.C. § 878, which explicitly states that "[s]tate and local law enforcement officers performing functions under this section shall not be deemed Federal employees and shall not be subject to provisions of law relating to Federal employees, except [5 U.S.C. 3374(c)]." 21 U.S.C. § 878(b). Section 3374(c) in turn enumerates the statutory provisions under which state or local government employees assigned or on detail to a federal agency shall be considered federal employees. See 5 U.S.C. § 3374(c)(2). Because § 3374(c) does not refer to § 115, Mr. Martin concludes that § 115 does not apply to special deputies like Detective O'Rourke, an employee of the city of Enid.

Mr. Martin's argument fails because it erroneously conflates the terms "officer" and "employee." While the statutes upon which Mr. Martin relies pertain to employment status, neither § 115(a)(1)(B) nor § 1114 require that the

object of the threat be a federal employee.  In holding that a special deputy U.S. marshal was a federal officer for the purposes of 18 U.S.C. § 111, an analogous federal assault statute that also incorporates § 1114, the Ninth Circuit noted that § 3374(c) "deals primarily with employment matters."  United States v. Diamond, 53 F.3d 249, 251 (9th Cir. 1995).   The Diamond court identified the dispositive factors under the assault statute as the officer's assistance to federal agents and his cross-deputation, rather than the source of his salary.  See id.

The holding in Diamond comports with the Supreme Court's view that Congress intended § 111 to protect federal functions as well as federal officers. See United States v. Feola, 420 U.S. 671, 679  (1975).  Other circuits construing the assault statute have reached similar conclusions.  See Bettelyoun, 16 F.3d at 853 (holding that tribal officers under contract with the Bureau of Indian Affairs were federal officers under §111); United States v. Oakie, 12 F.3d 1436, 1440 (8th Cir. 1993) (affirming jury finding that tribal officer was BIA special deputy performing federal functions when assaulted); United States v. Torres, 862 F.2d 1025, 1030 (3rd Cir. 1988) (concluding that officer assigned to DEA Task Force at time of assault "fell within the ambit of those persons sheltered by section 111").

Mr. Martin attempts to distinguish § 111 from § 115, the threat statute at issue here.  However, both the assault statute and the threat statute rely on

§ 1114's definition of protected persons. See 18 U.S.C. § 115(a)(1)(A), (B); 18 U.S.C. § 111(a). Furthermore, the contention that Bettelyoun and related cases are inapposite because the tribal officers in question derived federal authority from the Indian Law Enforcement Reform Act of 1990, see 25 U.S.C. § 2804(a), ignores the Eighth Circuit's observation that "[e]ven in the absence of a § 2804 contract, a tribal officer who has been designated as a Deputy Special Officer of the BIA is a federal officer within the meaning of § 111 when performing the federal duties he or she had been deputized to perform." Bettelyoun, 16 F.3d at 853 n.2. The Indian Law Enforcement Reform Act does not provide the sole basis of federal jurisdiction in cases involving tribal officers. See Oakie, 12 F.3d at 1440 & n.2 (government sustained the burden of proof that a tribal officer, acting without § 2804(a) contract, was enforcing federal law). Thus, we can look to § 111 decisions for guidance in determining whether Detective O'Rourke was a federal officer under § 115.

Like the officers in the § 111 cases, Detective O'Rourke was deputized to participate in a federal investigation during the time that the charged conduct occurred. Moreover, even if Detective O'Rourke had stopped working with the FBI by late August 1997, he still would have enjoyed the protection of § 115 because the threats could be construed as retaliation for earlier federal indictments with which he assisted. See United States v. Raymer, 876 F.2d 383,

390 (5th Cir. 1989) (stating that § 115 "clearly cover[s] an official not only while he was in the performance of his duties but also against retaliation after his duties were completed."). Hence, we hold that Detective O'Rourke was a federal officer within the meaning of §§ 115 and 1114 or, alternatively, that he would come within the scope of the relevant statutes as an individual assisting a federal officer. See Diamond, 53 F.3d at 252. The district court properly denied Mr. Martin's motion to dismiss for lack of jurisdiction.

B.  Sufficiency of the Evidence

Mr. Martin next contends that a reasonable jury could not have found that his statements constituted a true threat. In his view, the evidence indicated only that the threats arose from drunken indiscretion and did not reveal any serious intent to murder Detective O'Rourke.

When we consider the sufficiency of the evidence to sustain a criminal conviction, our task is to determine whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Morehead, 959 F.2d 1489, 1499 (10th Cir. 1992). Whether a statement constitutes a true threat under 18 U.S.C. § 115 represents a jury question to be reviewed in the light most favorable to the government. See United States v. Roberts, 915 F.2d 889, 891 (4th Cir.

1990).

We have not yet considered the requirements of a true threat under § 115; however, other circuits have analogized them to the elements of 18 U.S.C. § 871, the statutory provision protecting the President of the United States. See, e.g., id. at 890. Following the Supreme Court's definition of a true threat under § 871, see Watts v. United States, 394 U.S. 705, 707-08 (1969), this circuit has held that the wilfulness element of § 871 does not require present intent to inflict bodily harm. See United States v. Hart, 457 F.2d 1087, 1090 (10th Cir. 1972). Under § 871,

> it is not necessary to show that the defendant intended to carry out the threat, nor is it necessary to prove that the defendant actually had the apparent ability to carry out the threat.
> The question is whether those who hear or read the threat reasonably consider that an actual threat has been made. It is the making of the threat, not the intention to carry it out, that violates the law.

United States v. Welch, 745 F.2d 614, 618 (10th Cir. 1984) (quoting trial court's jury instructions in United States v. Dysart, 705 F. 2d 1247, 1256 (10th Cir. 1983) with approval). In Welch, evidence that the defendant "appeared to be angry but that he was lucid," id. at 619, was sufficient to sustain a § 871 conviction, even though the defendant was using large amounts of medication and suffered from attention deficit disorder. See id. at 617.

Other circuits' interpretation of § 115(a)(1)(B) tracks our definition of a

true threat under § 871. For example, the Fifth Circuit has held that, under § 115(a)(1)(B), "the key point is whether the defendant intentionally communicated the threat," not whether he intended or had the capability to carry it out. United States v. Stevenson, 126 F.3d 662, 664 (5th Cir. 1997) (citing United States v. Orozco-Santillan, 903 F.2d 1262, 1265 (9th Cir. 1990)). In Stevenson, the recipient of the threat reasonably feared violence, even though the defendant was incarcerated, because he might inflict harm upon his release. Stevenson, 126 F.3d at 665.

In the instant matter, Mr. Bennett testified that Mr. Martin did not appear to be drunk when he made the threat that formed the basis of the count of conviction. See 4 R. at 136. Moreover, on the tape played to the jury, Mr. Martin repeatedly reaffirmed his plans to shoot Detective O'Rourke – including his motives, the type of gun to be used, and his strategy for evading law enforcement. See Gov. Ex. 4-A. A rational jury could have evaluated the tape and the corroborating testimony to conclude that the threats were not merely drunken boasting. Moreover, testimony that Detective O'Rourke began taking special precautions when he learned of the threats could have convinced a reasonable trier of fact that the detective feared injury or death from Mr. Martin. See 4 R. at 59-60; see also United States v. Fulmer, 108 F.3d 1486, 1499 (1st Cir. 1997) (noting that several circuits consider "evidence of the recipient's reactions to the

- 10 -

alleged threat relevant"); Roberts, 915 F.2d at 890-91.

Mr. Martin also argues that, because he did not communicate the threats directly to Detective O'Rourke, the jury lacked sufficient evidence that he attempted to retaliate against or impede a federal officer within the meaning of § 115. This court has not required that true threats be made directly to the proposed victim. See United States v. Crews, 781 F.2d. 826, 829, 832 (10th Cir. 1986) (holding that threats against the President made to a psychiatric nurse violated § 871); Welch, 745 F.2d at 616, 620 (upholding § 871 conviction of defendant who communicated threats against the President to mental health employees and then to secret service agents); see also United States v. Raymer, 876 F.2d 383, 391 (5th Cir. 1989) (stating that "actual receipt" of the threat is not an element of a § 115 offense). Reviewing the evidence in the light most favorable to the government, we hold that a rational jury could have found Mr. Martin guilty beyond a reasonable doubt.

## C. Sentencing

Mr. Martin argues that the district court erred in its sentencing calculation because the presentence report ("PSR") on which it relied contained facts unsupported by credible evidence. The PSR recommended a six-level specific offense characteristic increase under U.S.S.G. § 2A6.1(b)(1), which applies if the defendant engaged in conduct showing intent to carry out his threats. See 2 R. at

- 11 -

5. In support of this recommendation, the PSR noted that Mr. Martin asked Mr. Bennett to purchase ammunition for his gun and drive to the Enid Police Department to case the site. See id. It also stated that Mr. Martin devised a detailed plan for killing Detective O'Rourke, told Mr. Bennett of this plan, and exchanged a .38 revolver for a .380 semi-automatic weapon to increase his firepower in a potential shootout with the detective. See id. Mr. Martin contends that the factors listed in this portion of the PSR "are wholly lacking in specificity and . . . reliability." See Aplt Br. at 27.

We review factual findings supporting a sentencing decision for clear error and will not disturb such findings unless they have no basis in the record. See United States v. Ivy, 83 F.3d 1266, 1289 (10th Cir. 1996); United States v. Hooks, 65 F.3d 850, 854 (10th Cir. 1995). Mr. Martin's objections to the § 2A6.1(b)(1) increase stem largely from his perception that the district court relied on testimony that the jury did not find credible. For example, he notes that the request for Mr. Bennett to buy ammunition allegedly occurred in the context of a count of which he was acquitted. Testimony about his acquisition of a .380 firearm also related to counts of which he was acquitted. According to Mr. Martin, acquittal indicates that the jury did not believe the witnesses who testified about his preparations to carry out his threats and thus that the § 2A6.1(b)(1) increase was improper.

- 12 -

The sentencing court has discretion to make credibility determinations for sentencing purposes, see Ivy, 83 F.3d at 1289, and we decline to review the credibility of a witness' testimony on appeal. See Hooks, 65 F.3d at 854. Even though the chief witness for the government was an informant, the district court enjoyed a better vantage from which to assess the credibility of his testimony than does an appellate court. See United States v. Garcia, 78 F.3d 1457, 1466 (10th Cir.), cert. denied, 517 U.S. 1239 (1996) (placing significance on the trial judge's ability to find "the informants' testimony to be sufficiently reliable after observing their demeanor in court").

Moreover, the fact that the sentencing court relied on incidents allegedly related to counts of which Mr. Martin was acquitted does not constitute error. We have held that "[a] sentencing court may look beyond the charges alleged in the indictment." United States v. Dennino, 29 F.3d 572, 578 (10th Cir. 1994). For similar reasons, we do not find clear error in a sentencing decision based on factors outside the count of conviction, so long as they possess sufficient indicia of reliability.

AFFIRMED.