# United States Court of Appeals
## For the First Circuit

No. 09-2263

UNITED STATES OF AMERICA,

Appellee,

v.

PASCUAL LUNA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Torruella, Boudin, and Lipez,
Circuit Judges.

Kenneth Seiger, for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney, was on brief for appellee.

August 12, 2011

**TORRUELLA**, **Circuit Judge**.  After opening fire on two police officers attempting to arrest him, Pascual Luna was charged with (1) being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1); (2) assaulting, resisting, opposing, impeding, intimidating, and interfering with Scott Conley, a detective with the Chelsea Police Department ("CPD") who had been deputized as a special federal officer, in violation of 18 U.S.C. § 111[1]; and (3) using and carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A). Luna moved to dismiss the second count of his indictment, arguing that because Conley was working as a Chelsea police officer under Chelsea supervision at the time of the alleged assault, he did not fall within the scope of 18 U.S.C. § 111.  The district court denied the motion to dismiss without prejudice to renewal during or after trial.  See United States v. Luna, No. 07-10195, 2008 WL 3285229, at *3 (D. Mass. Aug. 5, 2008).  Luna moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a), alleging that the evidence was insufficient to sustain a conviction on any of the charges, at both the close of the government's case

---

[1]  Section 111 allows for the federal prosecution of anyone who "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of [Title 18] while engaged in or on account of the performance of official duties."  See 18 U.S.C. § 111(a)(1).  Section 1114 protects "any officer or employee of the United States . . . while such officer or employee is engaged in . . . official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance."  18 U.S.C. § 1114.

-2-

and the close of all the evidence; the district court reserved judgment and then denied the renewed motion without explanation.

Luna now appeals, arguing that the district court erred in denying his motion to dismiss Count Two of the indictment and in failing to grant his motion for a judgment of acquittal as to the same count. He also raises various evidentiary and sentencing claims. For the reasons below, we affirm.

## I. Background

### A. Conley's Deputization

In 2006, Conley, a detective with the CPD, was assigned to the FBI's North Shore Gang Task Force ("Task Force"), a group composed of local, state, and federal law enforcement officers. In January 2007, Conley was officially deputized and his relationship with the FBI became more formal. According to his Deputation Statement, he was authorized to exercise "the powers of enforcement personnel set forth in [21 U.S.C. § 878]," and thus was permitted to

> (1) carry firearms;
>
> (2) execute and serve search warrants, arrest warrants, administrative inspection warrants, subp[o]enas, and summonses issued under the authority of the United States;
>
> (3) make arrests without warrant (A) for any offense against the United States committed in [his] presence, or (B) for any felony, cognizable under the laws of the United States, if [he had] probable cause to believe that the person to be arrested [had] committed or [was] committing a felony;

(4) make seizures of property pursuant to the provisions of this subchapter; and

(5) perform such other law enforcement duties as the Attorney General may designate.

21 U.S.C. § 878.

As a deputized Task Force officer, Conley was expected to work with other Task Force officers and to collect intelligence for the FBI. This work included, among other things, forwarding gang-related CPD reports to the FBI. At the hearing on his motion to dismiss, Conley testified that after he was deputized, he was assigned a partner from the State Police, Trooper Richard Ball, who was also a Task Force member; the two rode together during Conley's usual shift. In addition, although the CPD paid Conley's salary, the FBI provided funds that could be used to reimburse the City of Chelsea for up to 7.5 hours a week in Task Force-related overtime.

On a typical day on duty as a Chelsea police officer and Task Force officer, Conley and Ball would be in contact with some of the other agents working in the Task Force, including FBI Special Agent Jeff Wood. Conley would keep someone at the CPD -- at the relevant time, Lieutenant Dave Batchelor -- apprised of his activities. If something had to be done in Chelsea while Conley was "off the air" -- i.e., in a location where his Chelsea radio would not work -- he would not respond. If he was in Chelsea and received a Chelsea radio call but was in the middle of, e.g., a Task Force drug buy, he would not respond either. If he was within

-4-

range and not busy, he could respond to CPD calls.  As Conley testified at the hearing on Luna's motion to suppress, his Task Force knowledge was relevant even when he was responding to these local calls, and they would sometimes result in communications to the FBI:

> [W]hen I respond to these calls, if it was a shooting, if it was a fight, if it was a disorderly person at a park that we know to be a heavily saturated-gang area, I respond and I'd be able to conduct a field interview or make some observations and what an average patrol officer wouldn't be able to identify, I would be able to identify and I would take that information, take that report if I felt it was relevant and forward it to the FBI.

## B.  The Day of Luna's Arrest[2]

On May 1, 2007, the day of Luna's arrest, Conley had been assigned by the CPD to work at an immigration parade -- also referred to as a "rally" at trial -- that was going to pass through Chelsea.  He was wearing a CPD T-shirt and had a Chelsea badge around his neck and an FBI credential in his wallet.  Conley was working with Batchelor, the supervisor of the CPD gang unit, and Detective Daniel Delaney, a member of the CPD gang unit.  According

---

[2]  As explained below, we treat the question of whether Conley was engaged in official federal duties at the relevant time as a question about the sufficiency of the evidence, and thus we present the facts relevant to that issue in the light most favorable to the government.  See United States v. Rosado-Pérez, 605 F.3d 48, 52 (1st Cir. 2010) (noting that when reviewing a sufficiency-of-the-evidence claim, the court "take[s] the evidence and draw[s] all reasonable inferences in the light most favorable to the prosecution").

to Conley, the gang unit was working at the immigration rally because gang members had been violent at the rally in the past.

In addition, the FBI was interested in the immigration rally. When Conley spoke with Wood about the fact that he was going to be covering the immigration rally, Wood said that the FBI was interested in how many people would attend the rally. Wood said the FBI wanted to know any intelligence that was collected about gang members trying to disrupt or take part in the rally. In their conversation prior to the rally, Wood specifically asked Conley if he thought Luna would be at the rally; Conley responded affirmatively. As Conley testified at trial, he was interested in whether Luna would be at the rally because Luna was a gang member and the subject of state arrest warrants. According to Conley, "part of the reason why we were [at the rally] and part of the reason why the FBI was so interested in it, was because of collecting the intelligence of [sic] gang members in the City of Chelsea." Furthermore, according to the testimony of FBI Special Agent John Woudenberg, Conley's supervisor with respect to all Task Force matters, on the day in question, the FBI "would expect that Detective Conley would act as a member of the [T]ask [F]orce, would gather the appropriate intelligence and utilize that to further our investigations."

At a certain point, Conley saw Luna and alerted Batchelor and Delaney to his presence. The officers decided to arrest Luna

-6-

because there were Chelsea default warrants for his arrest.[3]  As the officers waited for the rally to pass by, Conley and Luna made eye contact and Luna started to quickly walk away.  Conley then got out of his vehicle; when Luna took off running, Conley began to chase after him.  At one point, when Conley was about ten feet from Luna, Luna turned around and shot at him and Delaney.  Luna was eventually wrestled to the ground by Officer Raul Goncalves, an Everett police officer.  Additional officers helped restrain Luna and he was eventually taken to the police department.

The FBI quickly received word of the arrest.  After Luna had been arrested, Conley called Wood.  Woudenberg had heard about Luna's arrest from Wood within approximately an hour of the shooting.  Conley did not produce a separate report for the FBI, but did send his CPD report regarding the incident to the FBI.[4] Conley did not file for FBI-funded overtime for May 1, 2007, the day of Luna's arrest, or for other days on which he was doing work related to Luna.  He testified at trial, however, that it was his practice to file for FBI overtime once a week and put down the number of hours allotted (between seven and eight hours of work), regardless of what work he did on which days.

---

[3]  There were no federal arrest warrants for Luna as of the day of the parade.

[4]  When asked about whether he had written a separate report for the FBI, he testified, "I don't do that.  I forward them the reports that I've already generated.  That's in the course of my duty."

## C. Procedural History

Luna moved to dismiss Count Two of his indictment on the ground that Conley was not covered by 18 U.S.C. § 111 "[b]ecause -- notwithstanding a federal deputation -- a local officer acting under local supervision is not a federal officer for the purposes of [section 1114 and thus] section 111." The district court treated the question of whether Conley qualified as a federal officer as a legal question for it to resolve and concluded that "Conley, as a sworn member of the FBI Task Force, was an 'officer or employee of the United States' within the meaning of § 1114 and thus was entitled to protection under § 111." Luna, 2008 WL 3285229, at *3. It noted that the question of whether Luna "shot at [Conley] . . . 'while [Conley] was engaged in or on account of the performance of official duties' is a question for the jury." Id.

The case proceeded to trial and Luna moved for a judgment of acquittal at the close of the government's case and after the close of all the evidence. He did not prevail, and the jury later convicted him on all counts.

## II.  Discussion

## A.  The Section 111 and 1114 Claims

Luna first argues that Count Two of his indictment should have been dismissed because the district court improperly concluded that Conley was a federal officer within the scope of 18 U.S.C.

§§ 1114 and 111. In addition, he argues that the government's evidence was not sufficient to prove that Conley was engaged in the performance of federal duties at the relevant time.

### 1. The Legal Framework and Standards of Review

18 U.S.C. § 111 provides for the punishment of anyone who "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of [Title 18] while engaged in or on account of the performance of official duties." 18 U.S.C. § 111(a)(1). Section 1114 designates the following individuals as part of the protected class: "any officer or employee of the United States or of any agency in any branch of the United States Government . . . while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance." 18 U.S.C. § 1114.

### a. Federal Officer Status

The question of whether a person in a particular position qualifies as an "officer . . . of the United States" under 18 U.S.C. § 1114 -- or what we refer to as a "federal officer" -- is a question of law. See United States v. Roy, 408 F.3d 484, 489 (8th Cir. 2005) ("Whether an officer in [the victim's] position, i.e., an officer of the Flandreau City and Flandreau Santee Sioux Tribal Police Department, qualifies as a federal officer is a

'threshold legal question' for the court." (quoting United States
v. Bettelyoun, 16 F.3d 850, 853 (8th Cir. 1994))); United States v.
Martin, 163 F.3d 1212, 1214 (10th Cir. 1998).[5] Thus, we review de
novo the district court's determination that Luna was eligible for
protection under section 111 as a "federal officer." See, e.g.,
United States v. Rodríguez-Vélez, 597 F.3d 32, 44 (1st Cir. 2010).

---

[5] The question of whether a given position confers "federal
officer" status under section 111 is a question of law, while the
question of whether a particular victim was in fact in that
position is a question of fact. See Roy, 408 F.3d at 489 ("Whether
[the victim] himself was [a federal] officer . . . [is a]
question[] of fact for the jury." (citing Bettelyoun, 16 F.3d at
853)); Martin, 163 F.3d at 1214 ("[W]hile the type of individual
encompassed by § 1114 is a legal question for the court, the jury
must decide the ultimate issue of fact -- whether [the victim] was
engaged in the performance of federal duties." (emphasis added));
United States v. Oakie, 12 F.3d 1436, 1440 (8th Cir. 1993) (noting
that "[w]hether a BIA Deputy Special Officer is an officer or
employee of the Department of Interior for purposes of § 111 is an
issue of law for the court" and later explaining that "[w]hether
[the specific victim] was in fact a BIA Deputy Special Officer" was
a "fact question[] for the jury"); see also United States v. Ama,
97 F. App'x 900, 901 (10th Cir. 2004) (noting that the "type of
individual encompassed by § 1114 is a legal question" (emphasis
added) (quoting Martin, 163 F.3d at 1214)).

The distinction is inconsequential here because Luna does not
dispute that Conley was in fact a deputized federal task force
officer. Cf. United States v. Torres, 862 F.2d 1025, 1030 (3d Cir.
1988) (court had to determine whether evidence was sufficient for
jury to conclude that officer had in fact been assigned to federal
task force). Thus, we phrase our analysis, as the parties and the
district court have, in terms of whether Conley, rather than
someone in Conley's position, was a federal officer by virtue of
his federal deputization.

## b.  Engagement in Official Duties

The question of whether an officer was engaged in "official duties" related to his or her federal deputization[6] at the relevant time is generally a question of fact for the jury, reviewed for sufficiency of the evidence. See, e.g., Roy, 408 F.3d at 489 ("Whether [the officer] himself was . . . engaged in official duties at the time of the incident [is a] question[] of fact for the jury."); United States v. Ama, 97 F. App'x 900, 901 n.2 (10th Cir. 2004) ("Whether an individual was engaged in official duties is a question of fact."); United States v. Dombrowsky, 111 F. App'x 716, 718 (5th Cir. 2004) (reviewing for sufficiency of the evidence the question of whether officers were engaged in the performance of official duties); United States v. Hoy, 137 F.3d 726, 729 (2d Cir. 1998) ("The question of whether an officer is engaged in an official duty is a factual one and therefore is properly left to the jury."); Bettelyoun, 16 F.3d at 853 (noting that it is for the "jury to decide whether the

---

[6]    We add "related to his federal deputization" because a state officer who is deputized to perform federal duties but who, e.g., only performs them in alternate weeks would not be protected as a "federal officer" when performing solely state -- albeit "official" -- duties, since the section 111 protection depends upon one's status as a federal officer. Cf. Bettelyoun, 16 F.3d 850, 853 n.2 (8th Cir. 1994) (noting, in the context of explaining an alternative means by which the government could have shown that a victim was a "federal officer," that "a tribal officer who has been designated as a Deputy Special Officer of the BIA is a federal officer within the meaning of § 111 when performing the federal duties he or she ha[s] been deputized to perform" (emphasis added)).

government proved . . . that the assault victims were in fact federal officers who were engaged in the performance of their official duties"); United States v. Green, 927 F.2d 1005, 1007 (7th Cir. 1991), overruling on other grounds recognized by United States v. Graham, 431 F.3d 585 (7th Cir. 2005); United States v. López, 710 F.2d 1071 (5th Cir. 1983) (noting that jury "could properly find under the evidence" that relevant officer was engaged in the performance of his official duties); United States v. Hohman, 825 F.2d 1363, 1365 (9th Cir. 1987) (reviewing for sufficiency of the evidence jury's conclusion that officer was assaulted "while engaged in or on account of . . . official duties"); United States v. Reid, 517 F.2d 953, 960 (2d Cir. 1975) ("While submission of the issue to the jury may have been unnecessary if, on the undisputed evidence, the assault on [the federal officer] occurred while he was engaged in or was on account of the performance of his official duties, such submission has been approved inferentially in some opinions, and doubtless is the wiser course." (citations omitted)); cf. United States v. Frizzi, 491 F.2d 1231, 1232 (1st Cir. 1974) (noting, in explaining why the court "[could not] quite say it was outside the scope of [a mail carrier's] employment" to "seek an apology" from a person who had spat on him, that "[a] jury should be permitted to choose between a personal frolic and standing up for his employer's right to have him pursue his duties unmolested").

Here, the court treated the question of whether Conley was engaged in official federal duties at the relevant time as a factual one.[7]  Because this appears to have been the appropriate

_____

[7]  When instructing the jury, the district court began by explaining that the fourth element of the section 111 charge required that Conley "was both[] (A) an officer or employee of the United States acting within the scope of his federal deputization as a federal officer, and (B) was performing federal investigative or law enforcement duties at the time."  The court later added the following instructions, noting that it had already concluded, as a legal matter, that Conley was a deputized member of a federal task force and thus a federal officer:

>    [I]t is the case that Mr. Conley was at the time of these events a Chelsea police officer with all of the authority of a Chelsea police officer.  He was also, however, deputized as a member of a federal task force and I have previously held in this case that he was, therefore, also a federal officer, but that's not the end of it.

>    First, the deputization defines the extent of his authority as a federal officer as a member of the task force, and the government has to prove . . . what Mr. Conley was authorized to do as a federal officer as a member of that task force.

>    Second, the government has to show that the activities he was engaged in at the time of and during the chase were federal official activities within the authorization.  That is, that he was performing federal investigative or . . . law enforcement activities at that time.

Finally, it added the following details regarding the fourth element of Count Two:

>    Concerning the fourth element, review the evidence of the documents that . . . are in evidence.  Consider what they say about the responsibilities of Mr. Conley and his role as a member of the task force.  Consider the testimony of the witnesses as to the nature of the task force work and specifically what Mr. Conley was doing for the task force.  Consider the evidence of his interaction

-13-

treatment in light of the case law, we analyze the jury's conclusion that Conley was performing official federal duties at the time of Luna's assault using the familiar sufficiency-of-the-evidence standard.[8]  See United States v. Troy, 583 F.3d 20, 24-25 (1st Cir. 2009).  In doing so, "we examine the evidence, both direct and circumstantial, in the light most favorable to the jury's verdict.  'We do not assess the credibility of a witness, as

---

with his superiors on the task force and specifically who directed and controlled his activities on May 1st, 2007.

Review the evidence as to his work for the Chelsea Police, what was his assignment on that day, what was he in fact doing on that day before and during the chase, and then decide whether the government has proven each of the four elements . . . .

[8]  This is not a typical section 111 case.  Typically, the question of whether a victim was "engaged in official duties" hinges on whether the victim was "acting within the scope of what [he] is employed to do" as opposed to being engaged in a "personal frolic," United States v. Kelley, 850 F.2d 212, 214 (5th Cir. 1988) (quoting United States v. Heliczer, 373 F.2d 241, 245 (2d Cir. 1967)), rather than on whether he was acting, at least in part, in a federal law enforcement capacity.  One could argue that although the question of whether a victim was engaged in a "personal frolic" is an appropriate factual question for the jury, the question of what constitutes being engaged in certain activities in both a federal and state law enforcement capacity is not, but Luna has not made a compelling argument to this effect.

We note, however, that to the extent that Luna is arguing that it was improper, as a matter of law, for the jury to consider more than the ten-minute time period during which Conley was pursuing him to execute a state arrest warrant when assessing whether Conley was engaged in official federal duties, we find this argument unpersuasive.  Cf. United States v. O'Connell, 703 F.2d 645, 650 (1st Cir. 1983) (noting that the court was unpersuaded that a federal officer was no longer engaged in the performance of official duties the moment he had handed the defendant the subpoena he had come to deliver).

-14-

that is a role reserved for the jury.'" Id. at 24 (citation omitted) (quoting United States v. Paret-Ruiz, 567 F.3d 1, 5 (1st Cir. 2009)). "Nor need we be convinced that the government succeeded in 'eliminating every possible theory consistent with the defendant's innocence.'" Id. (quoting United States v. Moran, 312 F.3d 480, 487 (1st Cir. 2002)). "Rather, we must decide 'whether that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime.'" Id. (quoting United States v. Cruz-Rodríguez, 541 F.3d 19, 26 (2008)).

### 2. Analysis

#### a. Status as a Federal Officer

Many of the criticisms that Luna lodges against the district court's legal conclusion that Conley was a "federal officer" would more appropriately be framed as arguments against the sufficiency of the evidence presented to show that Conley was "engaged in official duties" at the relevant time. We address only the first issue here, and conclude that the district court was correct in concluding that Conley was a "federal officer."

The First Circuit has not previously discussed whether a local police officer, deputized as a federal task force member, may be considered a "federal officer" for the purposes of 18 U.S.C. §§ 111 and 1114. The Supreme Court has provided some guidance in United States v. Feola, 420 U.S. 671 (1975), noting that the

purpose of 18 U.S.C. § 111 is "to protect both federal officers and federal functions."  Id. at 679.  Though the parties cite many cases from other circuits involving the relevant statutes, few are directly relevant to the question of whether a local police officer who has been deputized as a member of a federal task force, and whose general working relationship with federal authorities is similar to Conley's, can be protected under section 111 based on his or her own status as a "federal officer."

The case we find most comparable is United States v. Torres, 862 F.2d 1025 (3d Cir. 1988).[9]  There, the victim was a Philadelphia police officer who had been assigned to the Federal Drug Enforcement Administration ("DEA") Task Force.[10]  Id. at 1027. The opinion is short on details, but it appears that the victim's general role as a member of his task force was similar to Conley's because he was not fully integrated into a DEA unit but instead had many of the duties of a local police officer.  On the night in question, he had been patrolling with another undercover police

---

[9]  Although Torres is still good law as it relates to this case, we note that in Torres, the government made, and the court did not comment on, a concession regarding sentencing that would no longer be appropriate after Deal v. United States, 508 U.S. 129 (1993). Thus, the Third Circuit has said that "to the extent [Torres] may be interpreted as contrary to Deal, it is superceded by Deal." United States v. Casiano, 113 F.3d 420 (3d Cir. 1997).

[10]  The defendant-appellant claimed that the evidence at trial was insufficient for the jury to conclude that the officer was actually assigned to the task force, but the court found that the evidence was sufficient for the jury to make this finding.  Torres, 862 F.3d at 1030.

officer; he and his partner had stopped to investigate suspicious activity when the defendant pulled up in a vehicle and pointed a gun at him. Id. at 1026. The court concluded that the victim -- a DEA Task Force member who was, at the time of the assault, engaged in federal law enforcement duties -- was within the scope of section 111's protections. Id. at 1030. We similarly conclude that the district court properly determined that Conley -- a local police officer who had been deputized as a member of the Task Force -- was a "federal officer" for section 111 purposes.

### b. Engagement in Official Duties

Luna claims that the evidence was insufficient to support the conclusion that Conley was engaged in the performance of federal duties when Luna assaulted him. To support this contention, he points out the following: (1) Conley was ordered to work at the rally by the CPD, not the FBI; (2) while at the rally, Conley was in a CPD car, was wearing a CPD shirt, and had a CPD badge around his neck (though he carried an FBI credential); (3) Conley was working with two other Chelsea officers, and there was no contact with federal officers during the rally; (4) Conley decided to arrest Luna based on outstanding warrants from the Chelsea District Court rather than on a federal arrest warrant (which did not exist); (5) Conley did not file a separate FBI report and did not submit claims for FBI overtime for the day in question, instead submitting Chelsea overtime claims.

The government argues that Luna fails to appreciate that because of the nature of Conley's role, he was often wearing two hats, acting as both a Chelsea police officer and a Task Force member simultaneously. We agree, and conclude that the evidence at trial was sufficient for a rational jury to conclude that Conley was engaged in federal duties at the relevant time.

Although Luna was assigned to cover the rally by the CPD and was working with other Chelsea officers, his work was relevant to the mission of the Task Force, as demonstrated, generally, by the nature of his role -- to keep tabs on anything to do with gangs in his area -- and, specifically, by the conversations he had with FBI agents. When Conley spoke with one of his FBI contacts, Wood, about the fact that he was going to be covering the rally on May 1, Wood said that the FBI "was very interested in the numbers that the rally was going to bring" and that "they wanted to know any intelligence that [was] collected in regards to gang members trying to disrupt the rally or take . . . part in the rally." Furthermore, Wood "specifically asked [Conley] if [he] thought Pascual Luna would be there."[11] The fact that Conley was working with Chelsea officers, wearing a Chelsea shirt and riding in a Chelsea car, and executing a state warrant does not foreclose the possibility that he was playing a dual role at the relevant time.

---

[11] The FBI was aware of Luna because Conley had been investigating Luna with the FBI prior to the day of the rally.

In addition, Conley's actions after the assault are consistent with the conclusion that Conley was engaged in official federal duties at the relevant time. After Luna's arrest, Conley called Wood, who reported Luna's arrest to Woudenberg, Conley's FBI supervisor, within approximately an hour. Although Conley did not produce a separate report for the FBI, he sent his CPD report regarding the assault to the FBI. Finally, although he did not file for FBI overtime for May 1, this does not suggest that he was not engaged in Task Force work on the day in question; it was his practice to file for FBI overtime once a week, regardless of when he did what type of work.

We conclude that the evidence was sufficient for a rational jury to reach the conclusion that Conley was engaged in federal duties at the relevant time.

## B. Evidentiary Claims

### 1. Authentication of the Ammunition

Luna claims that the district court abused its discretion in admitting Luna's purported ammunition into evidence because the government failed to establish chain of custody and thus, according to Luna, the ammunition was not properly authenticated. The government responds that it submitted the ammunition on the basis of its connection to the firearm that the defendant used rather than by establishing chain of custody. We conclude that any error was harmless.

### a. Background

The government elected to connect Luna to the ammunition indirectly. The government called numerous witnesses to establish that the firearm introduced at trial was the one that Luna had on the day of the arrest. First, Conley identified the firearm as the one Luna had possessed on the day of the arrest. Over Luna's objection, the court admitted the gun into evidence. Goncalves, another officer who had been at the scene of the crime, later testified that he recognized the firearm that was in evidence because of its brown handle. Delaney, who was also at the crime scene, corroborated Goncalves's description of the handle, adding that revolvers, like Luna's firearm, were very rare on the streets. Finally, Batchelor, who had chased Luna after he shot at Conley, said that the gun at trial was the one he had seen the day of the arrest and testified that Luna's revolver was the only firearm of its type he had seen in 2007.

As for the ammunition, the district court admitted it into evidence over Luna's objection after Conley testified that he recognized the bullets and spent casing as items that another officer had shown him on the day of the assault. Later on, the government's ballistics expert, Trooper Lombard of the Massachusetts State Police, testified that he had conducted a firing test that demonstrated that the defendant's firearm shot the spent casing that had been admitted.

### b. Analysis

We review the admission or exclusion of evidence for abuse of discretion. United States v. Díaz, 597 F.3d 56, 64 (1st Cir. 2010).

Evidence must be authenticated before it may be admitted. Fed. R. Evid. 901(a). Prior to admitting evidence, "[t]he district court must determine 'if there is a reasonable probability the evidence is what it is purported to be.'" United States v. Barrow, 448 F.3d 37, 42 (1st Cir. 2006) (quoting United States v. Cruz, 352 F.3d 499, 506 (2003)). "[E]vidence . . . is properly admitted if it is readily identifiable by a unique feature or other identifying mark. On the other hand, if the offered evidence is of the type that is not readily identifiable or is susceptible to alteration, a testimonial tracing of the chain of custody is necessary." United States v. Anderson, 452 F.3d 66, 80 (1st Cir. 2006) (quoting United States v. Abreu, 952 F.2d 1458, 1467 (1st Cir. 1992)). If evidence is admitted prematurely because it is not yet authenticated, a court of appeals need not remand for a new trial if later testimony cures the error. See United States v. Blackwell, 694 F.2d 1325, 1331 (D.C. Cir. 1982) ("[E]ven if the photographs were not fully authenticated by the prosecution and their admission into evidence premature, any error was cured by the testimony of the defendant before the close of the trial. A new trial is therefore not required on this ground.").

Assuming, without deciding, that the district court abused its discretion in admitting the firearm and the ammunition after Conley's testimony alone, we still need not reverse; later testimony supported the conclusion that both were "what [they were] purported to be." Barrow, 448 F.3d at 42 (quoting Cruz, 352 F.3d at 506) (internal quotation mark omitted).

After the firearm had been admitted, the government elicited testimony that established its "unique feature[s]" or "identifying mark[s]." See Anderson, 452 F.3d at 80. Goncalves testified that the firearm at trial was the revolver he had picked up from the sidewalk after Luna had dropped it; on cross-examination, he explained that he had identified the revolver during his direct examination based on its distinctive brown handle. Delaney also testified at trial that he recognized the gun, and explained that it had distinctive wood grips and was, as a revolver, an unusual firearm to see on the streets. Finally, Batchelor testified that the firearm at trial was the same one he had seen on Luna on the day of the arrest, and later noted that the firearm, a "snub-nose .38 Special," was the only one of its type he had seen in 2007. As the authentication process demands only a "reasonable probability that the evidence is what it is purported to be," Barrow, 448 F.3d at 42 (quoting Cruz, 352 F.3d at 506) (internal quotation mark omitted), we conclude that the government offered sufficient support for the district court to enter the

firearm into evidence eventually, even if not at the early point when it actually did admit the gun; thus, there was no reversible error.

As for the ammunition, by the time the case was submitted to the jury, there was sufficient testimony to support the conclusion that "there [was] a reasonable probability" that it, too, was "what it [was] purported to be." Id. (quoting Cruz, 352 F.3d at 506) (internal quotation mark omitted). Lombard's ballistics examination established that the spent casing had been fired from Luna's firearm. His testimony authenticated the ammunition on the basis of the distinctive marks left by the firearm on the casing. See Anderson, 452 F.3d at 80. Assuming, without deciding, that the district court abused its discretion in admitting the ammunition during Conley's testimony, it would not have abused its discretion by admitting the evidence after Lombard's testimony, and thus we need not reverse.

## 2. Expert Testimony on "Interstate Nexus"

Luna claims that the district court committed plain error in admitting alleged hearsay testimony from the government's expert witness to prove that the ammunition presented at trial was sufficiently connected to interstate commerce to satisfy 18 U.S.C. § 922(g)[12] (i.e., to fulfill the "interstate nexus" requirement).

_____

[12] The statute makes it illegal for individuals in various categories "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition."

-23-

The government argues that it was entitled to offer expert testimony regarding the interstate nexus requirement that relied, in part, on outside sources that are typically consulted in the course of determining the provenance of ammunition. Luna did not object at trial, and thus we review only for plain error. See, e.g., United States v. Famania-Roche, 537 F.3d 71, 77 (1st Cir. 2008). Finding none, we affirm.

### a. Background

Special Agent Mattheu Kelsch of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") testified for the government as an expert in order to establish the requisite interstate nexus. Kelsch testified that he had been certified as an "interstate nexus expert" by the ATF, and the district court found him sufficiently qualified to testify as an expert. In Kelsch's opinion, the ammunition at trial had been manufactured outside the state of Massachusetts. He reached this conclusion based on his experience as well as consultation with an ATF database, an internet database, and an employee of the ammunition manufacturer. Critically, Special Agent Kelsch testified that the markings on the shell casing signified that it was manufactured by Remington Peters, which only manufactured ammunition in Connecticut and Arkansas.

---

18 U.S.C. § 922(g).

### b.  Analysis

The government can establish the interstate nexus element required under 18 U.S.C. § 922(g)(1) by showing that a defendant "possessed the [ammunition] in a state other than the one in which it was manufactured." United States v. Corey, 207 F.3d 84, 88 (1st Cir. 2000).  Expert testimony is appropriate to prove the interstate nexus element.  United States v. Cormier, 468 F.3d 63, 72 (1st Cir. 2006).  Experts may rely on "technical manuals, conversations with manufacturers, and [their] prior experience" in forming their opinions without running afoul of Federal Rule of Evidence 703.  Id. at 72 (citing Corey, 207 F.3d at 91–92). However, although an expert may rely on these sources, the entirety of his or her testimony cannot be the mere repetition of "the out-of-court statements of others."  Id. at 73 (quoting United States v. Smith, 869 F.2d 348, 355 (7th Cir. 1989)).

Kelsch's testimony clearly falls within the ambit of Corey and Cormier.  Kelsch relied on third-party sources in conjunction with, not to the exclusion of, his initial, independent determination.  His testimony was thus not simply a summary of out-of-court sources but a thorough opinion drawing on multiple sources to ensure accuracy.  Just as we stated in Cormier, "[w]e see no reason why an expert in [ammunition] identification could not reasonably rely on ATF manufacturing records," as well as a conversation with a manufacturer, "to determine the provenance of

-25-

[ammunition]."  Cormier, 468 F.3d at 72-73.  To conclude otherwise would effectively restrict the sources available to experts and reduce accuracy.  As we find no error, let alone plain error, Luna's argument is without merit.

## C.  Armed Career Criminal Act ("ACCA") Sentencing Claim[13]

The district court sentenced Luna to fifteen years' imprisonment for being a felon in possession of ammunition, pursuant to the Armed Career Criminal Act, see 18 U.S.C. § 924(e).  Section 924(e) provides that any person who (1) violates 18 U.S.C. § 922(g) -- which forbids, among other things, being a felon in possession of ammunition -- and (2) has three previous convictions,[14] punishable by more than one year, for either (a) violent felonies, (b) serious drug offenses, or both faces a fifteen-year mandatory minimum sentence.  See 18 U.S.C. §§ 924(e), 922(g).

Luna objected below to being sentenced as an armed career criminal both in a sentencing memorandum and at his sentencing hearing.  In his memorandum, he argued that (1) his 2005 Cambridge

---

[13]  Luna also raised another sentencing claim on appeal, but his argument has been foreclosed by the Supreme Court's recent decision in Abbott v. United States, 131 S. Ct. 18 (2010).

[14]  As the statute makes clear, "the term 'conviction' includes a finding that a person has committed an act of juvenile delinquency involving a violent felony."  18 U.S.C. § 924(e)(2)(C).

convictions[15] for resisting arrest and assault and battery on a police officer ("ABPO") were invalid because (a) he did not plead guilty knowingly and voluntarily and (b) his waiver of a jury trial was ineffective and invalid; (2) his 2005 Chelsea conviction for assault with a dangerous weapon ("ADW") was invalid because (a) his waiver of a jury trial was ineffective and invalid and (b) the facts were insufficient to support a guilty verdict; and (3) his 2000 Boston "youthful offender" adjudication for armed robbery is not a proper ACCA predicate under 18 U.S.C. § 924(e)(2)(B) -- which requires juvenile ACCA predicates to involve "the use or carrying of a firearm, knife, or destructive device" -- because (a) the Massachusetts armed robbery statute does not require the use of a knife, (b) the record does not reflect that Luna entered a guilty plea, and (c) the facts were insufficient for the court to adjudge him a youthful offender.[16] At his sentencing hearing, Luna added that his 2005 Chelsea conviction for ADW should not qualify as an ACCA predicate because the crime can be committed in a variety of

---

[15] The government, citing the Pre-Sentence Report, refers to these as 2004 convictions in the Somerville District Court, but the transcript Luna submitted shows that Luna pleaded guilty in 2005 in the Cambridge District Court.

[16] Although Luna objected below to the district court's use of a 2007 Malden conviction for possession of cocaine with intent to distribute as an ACCA predicate, he has not pursued this argument on appeal.

ways, not all of which require the use of a firearm, knife, or a destructive device.[17]

Luna's arguments on appeal have a different focus. Instead of primarily attacking the validity of the ACCA convictions, he argues that none of his three non-drug predicates meet the ACCA's "violent felony" requirement. The government argues that (1) Luna has forfeited his challenge to his designation as an armed career criminal because he made very different arguments below, and (2) Luna cannot prevail even on the merits. We assume, without deciding, that Luna's claims have not been forfeited and move on to the merits, reviewing de novo the question of whether at least three of his convictions qualify as predicate offenses. See United States v. Dancy, 640 F.3d 455, 464 (1st Cir. 2011).

### 1. The Legal Framework

The ACCA defines a "violent felony" as

any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that --

---

[17] Luna's counsel appears to have been merging the requirement of 18 U.S.C. § 924(e)(2)(B), governing which juvenile offenses are ACCA predicates, with the case law requiring a particular type of analysis for crimes that can be committed in a variety of ways (i.e., that are "non-generic"), not all of which involve violent force, see Section II.C.1, infra.

(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another . . . .

18 U.S.C. § 924(e)(2)(B). The first clause "is sometimes referred to as the 'force clause,'" and "[t]he portion of clause (ii) following the enumerated offenses is known as the 'residual clause.'" United States v. Holloway, 630 F.3d 252, 256 (1st Cir. 2011).

In determining whether each conviction qualifies as a "violent felony" under either of these clauses, we must "take a categorical approach," which means that "we may consider only the offense's legal definition." Id. We base our analysis on "the elements of the . . . crime, as specified in the state statutes that criminalize [the relevant conduct] and set forth standard charging language, and as interpreted by the [relevant state's] courts." Dancy, 640 F.3d at 468. We must "forgo[] any inquiry into how the defendant may have committed the offense." Holloway, 630 F.3d at 256.

The "first step" in this categorical approach is to "identify the offense of conviction." Id. (quoting United States v. Giggey, 589 F.3d 38, 41 (1st Cir. 2009)) (internal quotation

-29-

mark omitted). If the defendant was convicted under a statute that covers only one offense, this task is relatively straightforward. If, however, the statute covers more than one offense (like, e.g., the Massachusetts assault and battery statute, which criminalizes "(1) harmful battery; (2) offensive battery; and (3) reckless battery"), the court may only conclude that a conviction under that statute satisfies the ACCA if either (1) all of the possible offenses of conviction are violent felonies, or (2) the court can (a) ascertain, by looking at "a restricted set of documents," which offense underlies the conviction, and (b) conclude that the particular offense of conviction is a violent felony under the ACCA. Id. at 257; see also Johnson v. United States, 130 S. Ct. 1265, 1273 (2010).

For an offense to qualify as a predicate under the ACCA's "force clause," it must "[have] as an element the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i). As the Supreme Court recently held in Johnson, "physical force" is defined as "violent force -- that is, force capable of causing physical pain or injury to another person." 130 S. Ct. at 1271. For an offense to qualify as a predicate under the ACCA's "residual clause," on the other hand, it must be "roughly similar, in kind as well as in degree of risk posed, to the examples" listed in 18 U.S.C. § 924(e)(2)(B)(ii). Begay v. United States, 553 U.S. 137, 143

-30-

(2008). "An offense is similar in kind if it 'typically involve[s]' purposeful, violent, and aggressive conduct." Dancy, 640 F.3d at 466 (quoting Begay, 553 U.S. at 144-45). The residual clause does not simply cover "every crime that 'presents a serious potential risk of physical injury to another.'" Begay, 553 U.S. at 142 (quoting 18 U.S.C. § 924(e)(2)(B)(ii)).

## 2. Analysis

Luna concedes that his previous drug conviction is an ACCA predicate. In addition, Luna's claim that his Massachusetts conviction for ABPO is not a proper ACCA predicate has been foreclosed by Dancy, which held that "the Massachusetts crime of ABPO qualifies under the residual clause of the ACCA," even after Holloway, 630 F.3d 252, and Johnson, 130 S. Ct. 1265. Dancy, 640 F.3d at 470. Thus, we need only conclude that one additional offense falls under the ACCA's force clause or residual clause in order to affirm. We now turn to Luna's juvenile adjudication for armed robbery.

Under the ACCA, to qualify as a predicate "conviction," an "act of juvenile delinquency" must, in addition to meeting the requirements of the force clause or the residual clause, "involv[e] the use or carrying of a firearm, knife, or destructive device" and be a type of crime that "would be punishable by imprisonment for [a term exceeding one year] if committed by an adult." 18 U.S.C. § 924(e)(2)(B). Luna does not claim that his act of juvenile

-31-

delinquency did not involve a knife; he does, however, contend that it does not meet the requirements of the force clause.

To obtain an armed robbery conviction in Massachusetts, the government must prove that (1) "the defendant was armed with a dangerous weapon" (though it need not be used); (2) "the defendant either applied actual force or violence to the body of the person identified in the indictment, or by words or gestures put him in fear" (i.e., the defendant "committed an assault on that person"); and (3) "the defendant took the money or . . . the property of another with intent to steal it."  Commonwealth v. Rogers, 945 N.E.2d 295, 301 n.4 (Mass. 2011); see also Mass. Gen. Laws ch. 265, § 17 (defining an armed robbery perpetrator as one who, "being armed with a dangerous weapon, assaults another and robs, steals, or takes from his person money or other property which may be the subject of larceny").[18]

Luna contends that because these elements can be met if a defendant, while armed, puts his victim in fear using threatening words or gestures, the crime does not require violent force.  He does not, however, explain why, even if an armed robbery involves

---

[18]  Although the crime of armed robbery can be committed in two ways (using (1) actual force or violence or (2) words or gestures that put the victim in fear), see Commonwealth v. Santos, 797 N.E.2d 1191, 1195 (Mass. 2003) (referring to the two "form[s] of 'assault'" that can be "used to perpetrate [an] armed robbery"), we need not determine which version of armed robbery Luna committed because both versions are proper ACCA predicates, as discussed below.

-32-

only "threatening words or gestures," it does not have "as an element the . . . attempted use[] or threatened use of physical force." 18 U.S.C. § 924(e)(2)(B)(i). Insofar as he is claiming that the version of armed robbery involving threatening words or gestures does not involve the threat of force but rather involves the threat of something else, we reject his claim; Massachusetts case law makes clear that the threat involved is a threat of force. See Commonwealth v. Stewart, 309 N.E.2d 470, 476 (Mass. 1974) (noting, while discussing whether jury instructions were proper, that "if force or threat of force had been applied to a customer [at a supermarket] . . . who was trying to interpose himself or to call the police, a charge of robbery from that customer with respect to money of [the supermarket] could have been sustained" (emphasis added)); Commonwealth v. Rajotte, 499 N.E.2d 312, 313 (Mass. App. Ct. 1986) ("[T]he defendant argues that the taking was not effected by force or threat of force and hence was only a larceny and not a robbery." (emphasis added)); Commonwealth v. Dellinger, 409 N.E.2d 1337, 1342 (Mass. App. Ct. 1980) ("One element of robbery is that the taking be by force or threat of force from a person." (emphasis added)). Luna has also provided no reason for us to conclude that the type of force involved in armed robbery is not "violent force -- that is, force capable of causing physical pain or injury," Johnson, 130 S. Ct. at 1271 (emphasis omitted), and we see no reason to do so.

-33-

Thus, we conclude that Luna has three ACCA predicate convictions and affirm the district court's sentence.

### III.  Conclusion

For the reasons stated, we affirm the convictions and sentence.

**Affirmed**.