COMMONWEALTH vs. GUY AHART
(and a companion case[1]).

No. 93-P-793.

Suffolk. April 4, 1994. - October 21, 1994.

Present: SMITH, GILLERMAN, & GREENBERG, JJ.

*Practice, Criminal*, Required finding, Instructions to jury, Lesser included offense. *Robbery. Larceny. Joint Enterprise.*

At the trial of an indictment for unarmed robbery (a purse snatch), the judge correctly denied the defendant's request for an instruction on the lesser included offense of larceny from the person where the evidence provided no rational basis for acquitting the defendant of the greater offense and convicting him of the lesser. [570-571]

Evidence at the trial of an indictment for unarmed robbery was not sufficient for a rational trier of fact to conclude beyond a reasonable doubt that one of two defendants was a joint venturer; that defendant was entitled to a finding of not guilty. [571-572]

INDICTMENTS found and returned in the Superior Court Department on April 17, 1992.

A pretrial motion to suppress evidence was heard by *Robert W. Banks*, J., and the cases were tried before him.

*John P. Fulginiti* for Rolando Carr.

*Stephen Neyman* for Guy Ahart.

*Jane Woodbury*, Assistant District Attorney, for the Commonwealth.

GREENBERG, J. A jury in the Superior Court convicted the defendants of unarmed robbery, G. L. c. 265, § 19. Guy Ahart was convicted as the principal actor in this purse snatching case, and Rolando Carr was convicted, under a

---

[1]Commonwealth vs. Rolando Carr.

joint venture theory, as the driver of the get-away car.[2] Ahart asserts as error the judge's refusal to instruct the jury on the crime of larceny from the person, a lesser included offense of unarmed robbery. We find no error and affirm his conviction. Carr makes several arguments on appeal, principally whether the judge erred in denying his motion for a required finding of not guilty. We need not discuss all of the points Carr raises because we agree that the evidence presented by the government entitled Carr to a required finding of not guilty. *Commonwealth* v. *Smith*, 413 Mass. 275, 275-276 (1992). A rational jury, viewing the evidence in a light most favorable to the government, could not conclude that Carr participated in the robbery. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979).

In an attempt to shoulder its burden, the government presented four witnesses, in addition to the victim, as part of its case-in-chief. Based upon their testimony, the jury could have seen the facts as follows. We summarize the facts in the light most favorable to the Commonwealth.

On April 8, 1992, at about 8:30 A.M., Jeanne Gonsalves, a teacher's aide at the Ellis Mendell School in the Jamaica Plain section of Boston, was walking to work. As she neared the Stonybrook train station on Amory Street, she noticed a tall man leaning on a brick column looking at her. She passed by the man and continued north toward the school. Sensing that she was being followed, Gonsalves peered over her shoulder, saw the man on her trail and started to walk faster. While being followed, she noticed that the man was black, thin, at least six feet tall, had a goatee style moustache, and was wearing a tan jacket.

When Gonsalves reached the corner of Amory and Boylston Streets, she pushed the "walk" button so that she could cross to the other side of Amory. Upon reaching the curb on the other side of the street, she again glanced over her shoulder. The man was already halfway across the street. Becom-

---

[2] A third defendant, Mack Fisher, the owner and, at the time of arrest, the back-seat passenger of the car driven by Rolando Carr was tried jointly with these defendants and acquitted by the jury.

ing increasingly nervous, Gonsalves cradled her handbag in front of her and quickened her pace. The man overtook her and passed.

Remembering that a coworker's house was nearby on Amory Street, Gonsalves resolved to reach that house and seek refuge. Ahead of her on Amory Street, near the home of her coworker, the man she thought was following her walked over to a big, old, dark-colored car parked on the same side of the road. The front passenger door of the car was open three or four inches. The man put his hands on the car door and, while looking at Gonsalves, asked someone in the car for a cigarette. By this time, Gonsalves was only about three feet away.

Hoping to go inside, or at least ring the bell, Gonsalves turned and walked up the first set of stairs of her coworker's house. By the time she reached the second or third step of the second set of stairs, she felt someone pulling her back down. Gonsalves lost her balance, but did not fall. She screamed and hollered for help. The same man who had followed her snatched her handbag and was "running like nobody's business" north on Amory Street. Gonsalves turned and chased him. That pursuit, to put it mildly, involved a number of others in the vicinity.

When Gonsalves became winded, she stopped running. She walked to the school on School Street where she was met outside by another teacher. The teacher called the police, and the school principal stayed with Gonsalves until the police arrived.

Juan Sousa was driving his son to a nearby daycare center on Amory Street. Sousa heard Gonsalves' screaming and yelling and noticed a tall, thin man, wearing something tan or khaki, running up Amory Street toward School Street. Sousa turned left out of the daycare center onto Amory Street and, in his car, chased the man onto School Street, and then lost sight of him. Thinking the man was still running on School Street, Sousa passed a slow moving green car. He drove around, but could not find the man he saw running.

Paula Rodriguez was driving south on Amory Street taking two of her children to school. Rodriguez saw a tall, thin, dark-skinned man running in the opposite direction, grasping a pocketbook, chased by a screaming woman. The man turned onto School Street and was met by an old, large, green car with a creme-colored roof. In the car were two dark-skinned men. The door opened, the man jumped in and the car pulled away. Rodriguez followed in her car as the green car proceeded toward Washington Street. Other cars pulled between Rodriguez's car and the green car, but she was able to follow the car as it turned left onto Washington Street then left onto Columbus Avenue. After about five minutes, when she got to Centre Street, Rodriguez abandoned the pursuit so that she could get her children to school.

Officer Patricia Freeman and her partner, Officer Roger Burke, responded to the call from the school teacher and interviewed the witnesses who were gathered in front of the school. As a result of those interviews, Freeman recorded and broadcast a description of the suspect and the car; then they unsuccessfully searched the area for about twenty-five minutes. Both officers returned to the station to write the necessary incident reports.

In the broadcast and the reports, the robber was described as a black male, thin build, about six feet, one inch tall, wearing black jeans and a beige or tan coat. The car was described as a Cadillac with an olive-green body and a beige roof. On the back bumper of the car were two George Bush bumper stickers. Covering the rear license plate was a black cloth.[3]

Officer Kevin Welsh was on motorcycle duty the morning of April 8, 1992, when he heard Officer Freeman's broadcast describing the purse snatching, the suspects and their car.

---

[3]Officer Freeman testified that the details regarding the bumper stickers and the black cloth were described to her by a white male, about six one or six two with an orange-colored beard and orange hair who, in a white Yugo automobile, chased the suspects into the Roxbury area. This witness was not identified and, at trial, was reported to have moved to Illinois. His observations were related to the jury by Freeman without objection.

About fifteen minutes after the broadcast, Welsh went back to the station to pick up a cruiser and bring it to the maintenance section in South Boston. At about 9:15 A.M., while driving the cruiser on American Legion Highway near Blue Hill Avenue, Welsh noticed a green, 1972 Buick Electra automobile with a beige vinyl roof pulling into traffic. In the car were three black men. On the bumper were two George Bush bumper stickers.

Officer Welsh pulled behind the car and called operations for confirmation of the description that he had heard earlier. He activated his blue lights and siren. The green car accelerated as it turned left onto Blue Hill Avenue, and Welsh gave chase. At a top speed of about sixty or seventy miles per hour, the pursuit lasted only a few blocks. By positioning the cruiser behind and to the left of the green car, Welsh forced it to pull over and stop at 728 Blue Hill Avenue. Welsh could see the shoulders of the men in the green car move forward as if they were reaching for something on the floor of the car.

Welsh immediately got out of the cruiser. Both front doors of the green car opened, and two men got out. As soon as Welsh saw the doors opening, he drew his weapon and ordered the men to freeze. The two men, at gunpoint, did not move; the passenger in the back seat of the car also did not move. About twenty seconds later, backup units arrived, and the three men from the green car were handcuffed and put in a cruiser. Carr was the driver of the green car, Ahart was the front seat passenger, and Mack Fisher sat in the rear seat. During an inventory search of the vehicle, Welsh found two beige jackets in the front seat, and a black wool cap under the center console armrest on the front seat. In the black cap was a screw driver and a screw that fit the rear license plate mount.

Officers Freeman and Burke went to the victim's house and retrieved her and her daughter. Meanwhile, the three suspects from the green car were brought to Amory Street and stood, handcuffed, in front of a roadside fence near the daycare center. Ahart was wearing wire-rimmed, quarter-sized glasses. Gonsalves, the victim, sat in the back of the

cruiser on the same side of the road and, without hesitation, identified Ahart as the man who snatched her purse. She did not identify either of the other two individuals.

1. *Jury instructions concerning larceny.*

Ahart claims error in the judge's failure, upon his request, to charge the jury on larceny from the person (G. L. c. 266, § 25[*b*])[4] as a lesser included offense of unarmed robbery (G. L. c. 265, § 19[*b*]).[5] "A judge is required to charge the jury concerning lesser included offenses if the evidence provides a rational basis for acquitting the defendant of the crime charged and convicting him of the lesser included offense." *Commonwealth* v. *Egerton*, 396 Mass. 499, 503 (1986) (citation omitted).

"[N]either the prosecutor's theory of what occurred nor the defendant's theory raised any possibility of a finding of the lesser crime:" the prosecution contended that the defendant snatched the purse from the victim's shoulder; the defendant contended that someone else snatched the purse from the victim's shoulder. *Commonwealth* v. *Ford*, 35 Mass. App. Ct. 752, 756-757 (1994). The larceny statute, not requiring the use of force and violence, was "inapposite to the condition of the case." *Commonwealth* v. *Lashway*, 36 Mass. App. Ct. 677, 683 (1994). If a jury could find the defendant was misidentified, then the crime charged in the indictment, unarmed robbery, itself would crash. *Ibid*. While it is settled law that larceny from the person is a lesser included offense of unarmed robbery, *Commonwealth* v. *Jones*, 362 Mass. 83, 85-87 (1972), it is also the case that the snatching of a purse necessarily involves the use of force. *Id*. at 87-89. Cf. *Com-*

---

[4]General Laws c. 266, § 25(*b*), provides that "[w]hoever commits larceny by stealing from the person of another shall be punished by imprisonment in the state prison for not more than five years or in jail for not more than two and one-half years."

[5] General Laws c. 265, § 19(*b*), provides that "[w]hoever, not being armed with a dangerous weapon, by force and violence, or by assault and putting in fear, robs, steals or takes from the person of another, or from his immediate control, money or other property which may be the subject of larceny, shall be punished by imprisonment in the state prison for life or any term of years."

*monwealth* v. *Rajotte*, 23 Mass. App. Ct. 93, 94-95 (1986). The instruction was properly refused.

2. *Sufficiency of the evidence.*

Defendant Carr claims that the government failed to present enough evidence for any rational trier of fact to conclude beyond a reasonable doubt that he was a joint venturer in the purse snatching. We agree.

Viewed in its favor, the government's case against Carr consisted of the following. Forty-five minutes after the robbery, Carr was driving the vehicle that provided a means of get-away for the perpetrator. Carr sped up and provoked a high speed pursuit for two or three blocks. Two beige jackets were found in the front seat of the car. A black wool cap was found under the center console armrest on the front seat. In the black cap was a screw driver and a screw that fit the rear license plate mount.

The evidence failed to show the required nexus between the defendant and the robbery. See *Commonwealth* v. *Caterino*, 31 Mass. App. Ct. 685, 688 (1991). No one testified to having seen Carr in the get-away vehicle until forty-five minutes after the robbery. See *id.* at 689. It is true that an inference, albeit tenuous and remote, can be drawn that, if the defendant was driving the vehicle at 9:15 A.M., he was driving at 8:30 A.M.

A motion for a required finding of not guilty should be denied only "if all the circumstances including inferences [that are not too remote according to the usual course of events] are of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt." *Commonwealth* v. *Nickerson*, 388 Mass. 246, 251-253 (1983). However, "a conviction [cannot] rest upon the piling of inference upon inference or conjecture and speculation." *Commonwealth* v. *Caterino*, *supra* at 690.

"It is settled that mere association with the perpetrators of a crime, before and after its commission, will not establish a defendant's guilt as a principal." *Commonwealth* v. *Amaral*, 13 Mass. App. Ct. 238, 241 (1982). "To sustain a conviction on the theory of joint enterprise, the defendant must be

shown to have shared the mental state required for the crime, and to have assisted the principal intentionally in its commission. . . . There must be proof that the defendant somehow participated in committing the offense, by counseling, hiring or otherwise procuring the principal, by agreeing to stand by, at, or near the scene to render aid, assistance or encouragement if it became necessary, or to assist the perpetrator in making an escape from the scene." *Id.* at 241-242. The evidence presented by the government, even stretching inferences to their logical breaking points, fails on all accounts to satisfy this threshold standard.  See *Commonwealth* v. *Walsh*, 407 Mass. 740, 741-745 (1990); *Commonwealth* v. *Smith*, 413 Mass. at 279-282; *Commonwealth* v. *Caterino*, 31 Mass. App. Ct. at 688-690. Compare *Commonwealth* v. *Casale*, 381 Mass. 167, 172-176 (1980); *Commonwealth* v. *Longo*, 402 Mass. 482, 487-489 (1988); *Commonwealth* v. *Giang*, 402 Mass. 604, 609-610 (1988); *Commonwealth* v. *Stewart*, 411 Mass. 345, 350-354 (1991); *Commonwealth* v. *Amaral*, 13 Mass. App. Ct. at 243-244; *Commonwealth* v. *Seminara*, 20 Mass. App. Ct. 789, 801 (1985).

The judgment against Rolando Carr is reversed, the verdict is set aside, and the case is remanded to the Superior Court for entry of a finding of not guilty. The judgment against Guy Ahart is affirmed.

*. So ordered.*