# United States Court of Appeals
## For the First Circuit

No. 15-2365

UNITED STATES OF AMERICA,

Appellee,

v.

FOSTER L. STARKS, JR.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Kayatta, Circuit Judge,
Souter, Associate Justice,[*]
and Stahl, Circuit Judge.

Victoria R. Kelleher for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with
whom Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

June 28, 2017

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**KAYATTA**, **Circuit Judge**.    This case makes its second appearance on our docket.  The first appeal followed the conviction of Foster Starks, Jr. for possessing a firearm in violation of 18 U.S.C. § 922(g)(1).   We vacated that conviction because the district court erred in finding that Starks lacked standing to challenge the lawfulness of a traffic stop that led to his arrest and the discovery of a gun and ammunition in a car he was driving. See United States v. Starks (Starks I), 769 F.3d 83, 88–90 (1st Cir. 2014).   On remand, the district court adjudicated Starks's challenge to the traffic stop on its merits, ruling that the stop and the resulting search were lawful.   Following a second jury trial, Starks was again convicted.  He now asks that we set aside this conviction because the trial judge, Starks claims, effectively commented on the credibility of witnesses by telling the jurors that the judge had ruled prior to trial that the traffic stop was lawful.   Starks also contends that the district court erred in determining that he was subject to a 180-month mandatory minimum sentence under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e), on account of three prior convictions for the offense of armed robbery under Massachusetts law.   For the following reasons, we affirm Starks's conviction but vacate his sentence.

## I.

### A.

Starks's challenge to his conviction rests on a jury instruction. Starks does not claim that the instruction in any way misstated the law. Rather, he claims that when the trial judge told the jury that the judge had already found the police officer's stop of Starks to be lawful, the judge effectively commented on the credibility of the two key witnesses at trial and put additional facts before the jury that bore on the witnesses' credibility. Judicial comments on the credibility of a witness in a criminal trial before a jury are improper. See, e.g., United States v. Márquez–Pérez, 835 F.3d 153, 158 (1st Cir. 2016); United States v. Ayala-Vazquez, 751 F.3d 1, 28 (1st Cir. 2014). So, too, are judicial statements adding information to the record that bears on a witness's credibility. See, e.g., Quercia v. United States, 289 U.S. 466, 471–72 (1933); United States v. Cisneros, 491 F.2d 1068, 1075 (5th Cir. 1974). So we begin our inquiry by determining whether the trial court's instruction, in context, could be so understood by the jurors. Cf. United States v. Rivera-Rodríguez, 761 F.3d 105, 120–23 (1st Cir. 2014) (reviewing the record to determine if the trial judge's interventions created the appearance of bias). Toward that end, we summarize enough of the relevant evidence to allow us to gauge how the jurors might

- 3 -

reasonably have construed the instruction and, if necessary, how much and to what degree of likelihood prejudice[1] would have ensued.

On May 24, 2009, at around 10:00 or 11:00 P.M., Starks pulled over in the breakdown lane on Route 24 in Taunton, Massachusetts. He was driving a black Kia Sportage with the permission of an acquaintance who had rented the vehicle. Jason Vital, a Massachusetts state trooper, pulled over behind him, got out of his cruiser, and approached Starks's vehicle. When Starks exited the vehicle, Vital asked him if anything was wrong. Starks responded that he had just dropped a cigarette. Vital testified that Starks appeared nervous during this interaction; Starks testified that he was not nervous. After Starks retrieved his cigarette, he and Vital returned to their respective vehicles and pulled back onto Route 24.

Vital started following Starks. Vital testified that he noticed Starks drifting slightly into the next lane without signaling on three occasions. Starks testified, to the contrary, that he stayed in his lane and did not drift. Vital used his

---

[1] The parties disagree about what standard we should apply to determine whether reversal is necessary if we conclude that the district court commented on the credibility of witnesses. Some of our cases on this type of judicial error require serious prejudice, see Márquez-Pérez, 835 F.3d at 161–62; Rivera-Rodríguez, 761 F.3d at 123, while another applies multiple different standards, including the "harmless beyond a reasonable doubt" standard, see Ayala-Vazquez, 751 F.3d at 24-28. Because we conclude that the trial court's instruction did not comment on the credibility of witnesses, we need not resolve this apparent tension.

computer to check the registration on Starks's car and discovered that the car was registered to a rental company and listed as red rather than black. At that point, Vital pulled Starks over. Vital testified without contradiction that the color discrepancy alone justified pulling Starks over.

Vital approached Starks's driver's-side window and informed him that the registration indicated that Starks's car was red rather than black.[2] Starks responded that the car was a rental. Vital asked for Starks's license and registration, which Starks provided. On checking the status of Starks's license, Vital learned that it had been suspended for failure to pay a ticket. He placed Starks under arrest for driving with a suspended license.[3] Vital testified that after he asked Starks to exit the vehicle, Starks's "nervous level had grown exponentially." Starks testified that he was not nervous. After securing Starks in the back seat of the cruiser, Vital requested a tow of the rental car pursuant to state police policy. He then looked through the windows of the car with a flashlight. He saw a white Wal-Mart bag containing a box of ammunition in the front passenger's seat. He

---

[2] There was a discrepancy between Vital's testimony and Starks's testimony as to whether Vital mentioned the marked lanes violation when he pulled Starks over.

[3] Vital also suggested at trial that Starks's failure to present a user agreement from the rental car company indicated that he was not authorized to drive the vehicle.

opened the car door and searched the bag, whereupon he found more ammunition and a firearm wrapped in a black bandana.

Following our decision in Starks I, and prior to trial, Starks pressed his motion to suppress the firearm and ammunition, arguing that the stop was unconstitutional. The district court rejected this motion after a hearing at which Starks did not testify.

At trial, Starks did not contest that the Wal-Mart bag in his car contained a firearm and ammunition. Instead, his defense was that he came into possession of the Wal-Mart bag without knowing its contents.[4] The key points of his account are these: Starks's son, Dante, had been arrested on May 23 after his girlfriend reported to the police that he had assaulted her. On the evening of May 24, Dante called and asked Starks to go to his apartment to pick up clothing and documents for court. Starks drove to the apartment and encountered Dante's girlfriend. She agreed to retrieve the clothing and documents while Starks waited in the car outside. She walked out to the car with the Wal-Mart bag, which she placed in the front passenger's seat. Starks drove away without looking in the bag. To support this account, defense

---

[4] Starks also did not contest that the other elements of 18 U.S.C. § 922(g) were satisfied. He stipulated that he had been convicted of a felony punishable by over one year in prison. He did not contradict the government's evidence that the gun and ammunition had passed in interstate commerce.

counsel asserted that it made no sense for Starks to place a bag containing a gun and ammunition in the front passenger's seat of the car and to leave it there even after Vital pulled him over.

The government challenged Starks's account in two primary ways. First, the government pointed out that the Wal-Mart bag contained four bottles of prescription pills, all of which were prescribed to Starks. Starks specifically sought the return of these pills--along with the clothing and documents--after he was booked and released on bail. Second, the government questioned whether it was plausible that Starks would trust Dante's girlfriend to retrieve Dante's clothing and documents after she had reported Dante to the police. The government suggested that it was far more plausible that Starks had gone into Dante's apartment himself to retrieve the pills, the clothing, and the documents--and that he had taken the gun and ammunition too, so that Dante's estranged girlfriend wouldn't turn them over to the police.

During closing arguments, defense counsel sought to cast doubt on aspects of Vital's testimony. Counsel argued that during the first interaction, "[Starks] wasn't nervous. Trooper Vital would have you believe that he was nervous. . . . He was not somebody who was fearful of the police." Counsel relied on Starks's testimony that he had once worked as a truck driver to argue that he was not drifting from lane to lane without signaling: "[Starks] drives for a living. He knows at that point that there's

a trooper that's following behind him. . . .  Somebody who has a [commercial driver's] license and who relies on their license, doesn't drive in that way and they know how to drive."  On rebuttal, the government argued, for the first time, that Starks's nervousness while interacting with Vital was evidence he knew about the gun and ammunition on the seat next to him.

During the final jury charge, the district court gave the instruction that Starks now challenges on appeal.  The court instructed the jury:

> Legality of the traffic stop.  You have heard testimony by Trooper Vital and Mr. Starks about the circumstances surrounding Trooper Vital's stop of the rental car Mr. Starks was driving and the reasons for that stop.
> To the extent their descriptions of those circumstances differed, you may consider such testimony like any other testimony.  You are not called upon, however, to determine the legality of the stop.  Before the trial, I ruled that the stop was lawful.  That was a legal determination and you may not question my ruling.  However, the evaluation of the credibility of Trooper Vital, Mr. Starks, and the other witnesses is solely and entirely for you to determine, including all facts and circumstances about which you heard testimony.

The district court had previously instructed the jury that the judge's "opinion about the evidence in this case, if [he] ha[s] one, is totally irrelevant"; that the jury "should not interpret anything [the judge] ha[s] said or done during the trial as indicating what [he] think[s] about a witness or a piece of

- 8 -

evidence or what [he] believe[s] the verdict should be"; and that the jurors were "the sole judges of the credibility of the witnesses."

**B.**

The instruction on the legality of the stop, argues Starks on appeal, implicitly told the jury that a suppression hearing had occurred before trial, that Starks and Vital had given conflicting testimony at that hearing, and that the judge had found Vital to be more credible. That implicit comment on the respective credibility of the two central witnesses, he claims, tilted the jury's assessment of which witness spoke credibly at trial on the subject of whether Starks was nervous during the stop. This nervousness, the jury may have reasoned, evidenced his knowledge of the gun and ammunition in the Wal-Mart bag.

The government counters, first, that Starks failed to raise this objection when the instruction was given. We disagree. In response to the proposed instruction about the legality of the stop, Defense counsel argued specifically that "it's really an issue of credibility for the jury" to evaluate the contrasting testimonies of Starks and Vital and "[f]or the[] [jury] to be told that the stop is lawful . . . would then be taking that question of fact away from them." The trial judge understood Starks to be raising this issue, acknowledging "the possibility" that the jury might understand the instruction as "a removal of certain

- 9 -

credibility determinations from them."  The judge proposed adding the last sentence of the instruction to resolve Starks's objection, but defense counsel was not satisfied and renewed the objection after the charge.  It does not matter that defense counsel never used the words "due process" when stating the objection.  Such an omission, if one calls it that, is much like not specifically mentioning the Fourth Amendment when challenging the reasonableness of a search.  In either situation, a trial court understands the point being made.  So, we turn to the merits of the preserved objection.

On the merits, we agree with the government that the challenged instruction simply cannot carry the meaning Starks assigns to it.  The instruction itself provided no hint that the court's legal determination turned on an assessment of credibility or was the result of a hearing at which Starks and Vital testified.[5] To the contrary, both in its preface and in its conclusion, the instruction distinguished the legal ruling from questions of credibility.  Importantly, too, the evidence that the jurors did hear concerning the stop itself pointed to an obvious and highlighted reason for the court's ruling that did not touch on credibility.  Specifically, Vital testified that the car's color

---

[5] In fact, the court's legal determination did not turn on an assessment of relative credibility, as Starks did not testify at the suppression hearing.

did not match the color listed on the car's registration and that such a discrepancy itself justified the stop.[6]  Starks did not dispute or challenge either aspect of this testimony.

In sum, we have on the one hand something of a stretch: An argument that lay jurors would read judicial credibility endorsements into an unadorned statement by the trial judge that he found the stop lawful.  On the other hand, we have an explicit instruction that it was up to the jury to assess the witnesses' credibility, and an explanation for the lawfulness of the stop that had nothing to do with the witnesses' credibility.  All in all, we can find no direct or indirect comment on the credibility of the witnesses.  And while the instruction did communicate to the jury an additional fact not otherwise in evidence--that the court had made a legal determination about the stop prior to trial--Starks's only argument that the trial judge erred by communicating this fact is that it implied a comment on the witnesses' credibility.[7]  Having rejected the notion that such an implication was conveyed in these circumstances, we find no error.[8]

---

[6] We express no opinion as to whether Vital's testimony on this point correctly stated the law.

[7] Starks did not adequately brief, and therefore waived, other potential bases for challenging the instruction.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

[8] A trial court may not always reliably predict how an instruction of this type might be interpreted in context.  In the event a trial court concludes that such an instruction is warranted, it might well be better practice simply to give the

We turn next to whether the district court properly found that Starks had at least "three previous convictions by any court . . . for a violent felony" under the ACCA, thereby triggering a mandatory minimum sentence of fifteen years' imprisonment for violating 18 U.S.C. § 922(g).  See 18 U.S.C. § 924(e)(1).  The ACCA defines a "violent felony," in relevant part, as

> any crime punishable by imprisonment for a term exceeding one year . . . that--
>     (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>     (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

Id. § 924(e)(2)(B).  We refer to clause (i) as the "force clause" and understand "physical force" to mean "violent force--that is, force capable of causing physical pain or injury to another person."  Johnson v. United States (Johnson I), 559 U.S. 133, 140 (2010).  Clause (ii) is not at issue here because armed robbery is not one of the enumerated offenses in the "enumerated offense clause" and the "residual clause"--the clause deeming a violent

_____

jury an instruction along these lines:  "Any challenges to the lawfulness of a stop are for me to resolve.  You need not be concerned about them."

- 12 -

felony any crime that "otherwise involves conduct that presents a serious potential risk of physical injury to another"--has been declared unconstitutionally vague, see Johnson v. United States (Johnson II), 135 S. Ct. 2551, 2557 (2015).

At sentencing, the parties contested whether Starks had three prior convictions for "violent felon[ies]" within the meaning of the ACCA. Starks's presentence investigation report (PSR) indicated that he had at least three prior convictions for armed robbery arising from separate occasions,[9] one prior conviction for armed robbery while masked, two prior convictions for unarmed robbery, and one prior conviction for armed assault with intent to rob, all under Massachusetts law. Most of the armed and unarmed robbery convictions occurred in 1991. The exceptions are a conviction for armed robbery while masked in 1996 and a conviction for armed robbery in 1998. Starks did not dispute that he had been convicted of the offenses listed in his PSR, but he argued that those offenses were not violent felonies.

The district court understood our decision in United States v. Luna, 649 F.3d 91 (1st Cir. 2011), to hold that

---

[9] The PSR lists nine different counts of armed robbery, based on events that occurred on seven different dates, in six different paragraphs. We have not been asked to determine how many of these convictions arose from separate occasions, so we do not decide this question. Starks has not challenged on appeal that if Massachusetts armed robbery is a violent felony, then he has at least three prior convictions for violent felonies arising from separate occasions.

Massachusetts armed robbery is a violent felony under the force clause, and it therefore applied the ACCA mandatory minimum. Starks objected at the sentencing hearing, arguing that under Massachusetts law, it is possible to satisfy the elements of armed robbery without using violent force. On appeal, he raises the same argument. He also argues that if armed robbery is not a violent felony, then he does not have the requisite three convictions for violent felonies, since unarmed robbery and armed assault with intent to rob are not violent felonies either.

We review a preserved claim that a prior conviction does not satisfy the ACCA definition of a violent felony de novo. See United States v. Faust, 853 F.3d 39, 50 & n.9 (1st Cir. 2017). Our analysis proceeds in two steps. First, we consider whether Massachusetts unarmed robbery is a violent felony. After concluding that it is not, we consider, second, whether armed robbery is a violent felony. Contrary to what the name of the offense implies, we conclude that the offense as actually defined is not.[10] Before getting to this analysis, however, we set out the unfortunately reticulated procedure by which we must evaluate whether crimes are violent felonies under the force clause.

---

[10] We do not address whether armed assault with intent to rob is a violent felony, since Starks does not qualify for the ACCA mandatory minimum sentence if neither armed nor unarmed robbery are violent felonies.

- 14 -

**B.**

**1.**

A crime only qualifies as a violent felony under the force clause if it "has <u>as an element</u> the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i) (emphasis added). The Supreme Court has interpreted this language to mean that we must take the "categorical approach" to determine whether a defendant's prior conviction for a certain crime satisfies the force clause. <u>See</u> <u>Shepard</u> v. <u>United States</u>, 544 U.S. 13, 19 (2005) (describing the language of the ACCA as "imposing the categorical approach" by "refer[ring] to predicate offenses in terms not of prior conduct but of prior 'convictions' and the 'element[s]' of crimes" (quoting <u>Taylor</u> v. <u>United States</u>, 495 U.S. 575, 600–01 (1990))); <u>Taylor</u>, 495 U.S. at 602; <u>Faust</u>, 853 F.3d at 62 (Barron, J., concurring). On this approach, the question does not turn on whether the defendant used, attempted to use, or threatened to use violent force in committing the crime as a matter of historical fact, but on whether the use, attempted use, or threatened use of violent force is required to satisfy one of the crime's elements. <u>See</u> <u>United States</u> v. <u>Whindleton</u>, 797 F.3d 105, 108 (1st Cir. 2015), <u>cert. dismissed</u>, 137 S. Ct. 23 (2016), <u>and cert. denied</u>, 137 S. Ct. 179 (2016); <u>cf.</u> <u>Mathis</u> v. <u>United States</u>, 136 S. Ct. 2243, 2248 (2016) (noting, in an enumerated offense clause case, that the

ACCA is concerned with the elements of a crime, and "cares not a whit" about the facts underlying a particular conviction); id. at 2251-52 (collecting cases saying similar things); Descamps v. United States, 133 S. Ct. 2276, 2283 (2013). A court determining whether a crime satisfies the force clause therefore does not focus on the name of the offense, or on what we think someone convicted of the offense likely did. See Taylor, 495 U.S. at 590-91, 600-02. Rather, we consider only whether the least serious conduct for which there is a "realistic probability" of a charge and conviction necessarily involves the use of violent force. See Moncrieffe v. Holder, 133 S. Ct. 1678, 1684-85 (2013); United States v. Fish, 758 F.3d 1, 6 (1st Cir. 2014). In short, even if most armed robberies are in fact violent, if a conviction can be obtained without proof of violent force, then the offense does not qualify as a violent felony under the ACCA's force clause.

We rely on state law for the elements of the crime and what conduct satisfies those elements. See Johnson I, 559 U.S. at 138. In determining whether the least serious conduct that satisfies those elements involves the "use, attempted use, or threatened use of physical force against the person of another," however, we interpret a federal statute and do not defer to state law. See id.

The above analysis must be modified to address crimes that can be committed in multiple different ways. "Some

statutes . . . have a more complicated (sometimes called 'divisible') structure . . . . A single statute may list elements in the alternative, and thereby define multiple crimes." Mathis, 136 S. Ct. at 2249. "To address that need, th[e Supreme] Court approved the 'modified categorical approach' for use with statutes having multiple alternative elements." Id. "Under that approach, a sentencing court looks to a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of." Id. (citing, inter alia, Shepard, 544 U.S. at 26); see also United States v. Castleman, 134 S. Ct. 1405, 1414 (2014) (applying modified categorical approach when analyzing crime under the force clause of the definition of a misdemeanor crime of domestic violence); Johnson I, 559 U.S. at 144–45 (noting that modified categorical analysis would limit the "practical effect" of the Court's interpretation of ACCA's force clause). We call this limited class of documents "Shepard documents."

Not all crimes that can be committed in multiple different ways are divisible into multiple crimes with different elements. There is "a different kind of alternatively phrased law: not one that lists multiple elements disjunctively, but instead one that enumerates various factual means of committing a single element." Mathis, 136 S. Ct. at 2249. In order to determine whether a crime that may be committed in multiple different ways

is divisible, we must be able to distinguish between crimes that have alternative elements and crimes that have a single set of elements that may be satisfied by different means.

The Supreme Court and this court have recognized several ways of distinguishing elements from means. Most fundamentally, elements must be found unanimously by a jury, while means need not be. See id. at 2248. So, in Mathis, the Court concluded that an Iowa burglary statute that criminalized the burglary of a number of different locations was indivisible because the Iowa Supreme Court had held that "a jury need not agree on which of the locations was actually involved." Id. at 2250 (quoting State v. Duncan, 312 N.W.2d 519, 523 (Iowa 1981)). Following Mathis, we have identified the elements of a crime by determining what facts the state supreme court requires a jury to find unanimously. See United States v. Tavares, 843 F.3d 1, 15 (1st Cir. 2016), reh'g denied, 849 F.3d 529 (1st Cir. 2017). The relevant state model jury instructions provide guidance on that question. See Faust, 853 F.3d at 57–58. The text of the criminal statute itself may also distinguish elements from means. "If statutory alternatives carry different punishments, then . . . they must be elements. . . . And a statute may itself identify which things must be charged (and so are elements) and which need not be (and so are means)." Mathis, 136 S. Ct. at 2256; see also Descamps, 133 S. Ct. at 2290 ("A prosecutor

- 18 -

charging a violation of a divisible statute must generally select the relevant element from its list of alternatives.").

Finally, "if state law fails to provide clear answers" about what is an element and what is a means, "federal judges have another place to look:  the record of a prior conviction itself." Mathis, 136 S. Ct. at 2256.  By "the record of a prior conviction" Mathis means, we assume, the Shepard documents.  Mathis provides an example:

> Suppose, for example, that one count of an indictment and correlative jury instructions charge a defendant with burgling a 'building, structure, or vehicle' . . . .  That is as clear an indication as any that each alternative is only a possible means of commission, not an element that the prosecutor must prove to a jury beyond a reasonable doubt.  So too if those documents use a single umbrella term like 'premises':  Once again, the record would then reveal what the prosecutor has to (and does not have to) demonstrate to prevail.  Conversely, an indictment and jury instructions could indicate, by referencing one alternative term to the exclusion of all others, that the statute contains a list of elements, each one of which goes toward a separate crime.

Id. at 2257 (citation omitted).  If neither state law nor the Shepard documents "speak plainly" about whether a crime is divisible, a sentencing court must assume that it is not.  See id.

The divisibility analysis must also recognize that state laws can change over time.  For instance, a state crime may be divisible at one point but, due to an intervening piece of

legislation or court decision, become indivisible or unclear.  In the ACCA context, this court has held that the relevant question is whether the crime was divisible at the time of the defendant's prior conviction.  See Faust, 853 F.3d at 57 (citing McNeill v. United States, 563 U.S. 816, 820 (2011)).  This approach comports with Mathis, as consulting the Shepard documents to ascertain divisibility will yield an answer that is indexed to the time at which the defendant was charged with and convicted of the crime.

**2.**

Applying the foregoing mode of analysis, we first consider whether Massachusetts unarmed robbery is a violent felony.  We start with the text of the statute:

> Whoever, not being armed with a dangerous weapon, by force and violence, or by assault and putting in fear, robs, steals, or takes from the person of another, or from his immediate control, money or other property which may be the subject of larceny, shall be punished by imprisonment in the state prison for life or for any term of years.

Mass. Gen. Laws ch. 265, § 19(b).  This statute contains several lists of different ways to commit the crime.  For the purposes of this opinion, we focus on one set of alternatives:  robbery "by force and violence" and robbery "by assault and putting in fear."  Massachusetts courts describe these alternatives as involving different types of force:  "actual force" and "constructive force."

See, e.g., Commonwealth v. Jones (Jones I), 283 N.E.2d 840, 843 (Mass. 1972).

The government does not argue that Massachusetts unarmed robbery is divisible into different crimes based on the type of force used. We accept this concession and do not decide the issue.[11] Given the government's concession, if either way of committing unarmed robbery is not a violent felony, unarmed robbery is categorically not a violent felony.

Starks's argument that unarmed robbery is not a violent felony focuses on the actual-force form of the offense, and we follow his lead.[12] According to the Massachusetts Supreme Judicial

---

[11] No precedent plainly calls into question the correctness of the government's concession. The Massachusetts Appeals Court has concluded that an indictment for unarmed robbery need not charge what type of force the defendant used. See Commonwealth v. Jones (Jones II), 426 N.E.2d 726, 727 (Mass. App. Ct. 1981) ("The particular type of force, actual or constructive, by which the robbery is committed is not an essential element of the crime, and it need not be pleaded in the indictment."). This holding is consistent with the language Massachusetts statutory law has long deemed "sufficient" for a robbery indictment. See Mass. Gen. Laws ch. 277, § 79 ("Robbery. (Under Chap. 265, Sec. 19.)--That A.B. did assault C.D. with intent to rob him, and thereby did rob and steal from the person of said C.D. (mention the property) of the property of said C.D."); An Act to Provide for the Simplification of Criminal Pleadings, 1899 Mass. Acts 411, 432 (listing form of robbery indictment identical to that provided in modern statute). This rule, extant at the time of all of Starks's robbery convictions, may support a conclusion that unarmed robbery is not divisible. See Mathis, 136 S. Ct. at 2256; Descamps, 133 S. Ct. at 2290.

[12] Starks may have focused his argument in this way because there is a good argument that constructive-force unarmed robbery has as an element the threatened use of physical force against the person of another. To prove the constructive-force form of the

Court (SJC), "[w]hether actual or constructive force is employed, the degree of force is immaterial so long as it is sufficient to obtain the victim's property 'against his will.'"  Id. at 843 (quoting Mass. Gen. Laws ch. 277, § 39).  Jones I illustrates how little force is necessary for an unarmed robbery conviction.  That case considered whether a purse snatching, which the victim did not resist, involved the use of actual force.  The SJC held that purse snatching

> necessarily involves the exercise of some actual force . . . .  [W]here, as here, the actual force used is sufficient to produce awareness, although the action may be so swift as to leave the victim momentarily in a dazed condition, the requisite degree of force is present to make the crime robbery.

Id. at 845.  As the Massachusetts Appeals Court has put it, under Jones I, "the bare act of snatching a purse from the hand of a victim, in the absence of any prior awareness by the victim of the

---

offense, "there must be, in addition to the elements of simple larceny, some objectively menacing conduct by the defendant, undertaken with the intent to put the victim in fear for the purpose of stealing his property, and resulting in reasonable fear or apprehension on the part of the victim facilitating the theft." Commonwealth v. Marcotte, 466 N.E.2d 127, 129 (Mass. App. Ct. 1984) (in armed robbery case); see Commonwealth v. Davis, 873 N.E.2d 1200, 1202 (Mass. App. Ct. 2007) (same in unarmed robbery case); see also Commonwealth v. Garrett, 41 N.E.3d 28, 37 (Mass. 2015) (actual fear or apprehension required for constructive-force unarmed robbery); Commonwealth v. Joyner, 4 N.E.3d 282, 293 (Mass. 2014) (for constructive-force armed robbery, "objectively menacing conduct" and "intent to put the victim in fear" are required (quoting Marcotte, 466 N.E.2d at 129)).  Thus, name notwithstanding, the actual-force form of unarmed robbery may be the less serious form of the offense.

impending act, is sufficient to constitute the element of force required for unarmed robbery" even where the defendant "touch[es] neither [the victim's] hand nor . . . body." Commonwealth v. Brown, 318 N.E.2d 486, 487 (Mass. App. Ct. 1974). Jones I remains good law. See Commonwealth v. Zangari, 677 N.E.2d 702, 702-03 (Mass. App. Ct. 1997) (upholding a conviction for unarmed robbery where, after the victim was dropped off outside her home and walked up the steps, "[s]he felt someone snatch her purse from under her arm," "[s]he was stunned," and, "[t]urning, she saw the back of a man running down [the street]"); see also Commonwealth v. Moran, 442 N.E.2d 399, 403 (Mass. 1982); Commonwealth v. Ahart, 641 N.E.2d 127, 131 (Mass. App. Ct. 1994).

The government points to passages in Jones I that explain the SJC's reasoning to argue that robbery satisfies the force clause. For instance, the SJC noted that "[h]istorically . . . the law has singled out the robber from other thieves because of his readiness to inflict bodily injury upon his victims." Jones I, 283 N.E.2d at 844. The SJC also distinguished robbery from larceny in a footnote by quoting a draft of the Model Penal Code: "The ordinary citizen feels himself able to guard against surreptitious larceny . . . to some extent, by his own wits or caution. But he abhors . . . (the robber[] whose) hardihood . . . enables him to carry out his purpose in the presence of his victim and over his opposition." Id. at 844 n.6 (quoting Model Penal Code § 222.1,

- 23 -

cmts. (Am. Law Inst., Tentative Draft No. 11, 1960))).  In the government's view, these observations mean that the actual-force form of Massachusetts robbery "has as an element the . . . threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i).

We are not persuaded.  The SJC offered these observations to justify its decision to depart from the more common rule, under which robbery requires some resistance by or injury to the victim, and to require only sufficient force to make the victim aware of the taking.  See Jones I, 283 N.E.2d at 844-45, 844 n.5.  Despite these observations, to convict a defendant of robbery by actual force, a jury need not find that the victim felt threatened, that the defendant intended to use violent force if the victim resisted, or that the use of violent force was otherwise impending.  See United States v. Delgado-Sánchez, 849 F.3d 1, 10 (1st Cir. 2017) (noting ambiguity in meaning of "threatened use of physical force").  The SJC's observations amount to the judicial equivalent of the Maine legislature's decision to label the mere possession of two grams of a mixture containing heroin "trafficking."  See United States v. Mulkern, 854 F.3d 87, 96 (1st Cir. 2017). Whatever label state law may give an offense and whatever justification a state may offer for defining an offense in a particular way, the ACCA definition of a violent felony turns on a crime's elements, not the beliefs that may have led to the

adoption of those elements.  Cf. id. (quoting, inter alia, Taylor, 495 U.S. at 590-91).

Thus, under the actual holding of Jones I, as interpreted and applied by the Massachusetts courts, the minimum conduct criminalized by the unarmed robbery statute is snatching a purse using just enough force to make the victim aware of the purse snatching, but without touching the victim, without any awareness by the victim of the impending act, and without any intention to use force against the victim if the victim resists.  It is a question of federal law whether such conduct involves "force capable of causing physical pain or injury to another person." Johnson I, 559 U.S. at 140.  We conclude that it does not.

This result follows from our precedent.  In Mulkern, we held that one subsection of Maine's robbery statute was not a violent felony because the Maine Law Court had concluded that "'any physical force'--e.g., pulling a purse from a person's hand--[wa]s 'sufficient force to convict of robbery'" under that subsection. Mulkern, 854 F.3d at 92-94 (quoting Raymond v. State, 467 A.2d 161, 164-65 (Me. 1983)).  In reaching that conclusion, the Maine Law Court had described the SJC's opinion in Jones I as "persuasive."  Raymond, 467 A.2d at 164.  Although in Mulkern we explicitly disclaimed expressing any opinion on Massachusetts law, see 854 F.3d at 94, the logic of the opinion extends directly to unarmed robbery as defined by Jones I.  Likewise, in United States

v. Castro-Vazquez, 802 F.3d 28 (1st Cir. 2015), we stated in dicta that if Puerto Rico law allowed a conviction for robbery based on the "slightest use of force," it would not qualify as a violent felony under the force clause. Id. at 37-38. And in United States v. Martinez, 762 F.3d 127 (1st Cir. 2014), we held that Massachusetts simple assault is not a crime of violence under the force clause of the career-offender sentencing guideline because an assault could be accomplished by an attempted or threatened "mere touching." Id. at 137-38. As Massachusetts unarmed robbery only requires force sufficient to make the victim aware of the theft, it may involve no more force against the victim than a mere touching. Under our precedent, therefore, Massachusetts unarmed robbery does not satisfy the force clause of the ACCA.

**3.**

Turning to Massachusetts armed robbery, we start once again with the language of the statute. The Massachusetts armed robbery statute reads:

> Whoever, being armed with a dangerous weapon, assaults another and robs, steals or takes from his person money or other property which may be the subject of larceny shall be punished by imprisonment in the state prison for life or for any term of years . . . .

Mass. Gen. Laws ch. 265, § 17. The SJC has parsed these elements as follows:

> The elements of the crime of armed robbery are that a defendant, while armed with a dangerous

> weapon, assaulted another person, and took
> money or property from the person with the
> intent to steal it. A defendant need not have
> used or displayed the dangerous weapon during
> the robbery; it is sufficient that the
> prosecutor prove that the robber possessed the
> dangerous weapon during the robbery.

Commonwealth v. Anderson, 963 N.E.2d 704, 718 (Mass. 2012) (citations omitted). Crucially, "the crime of armed robbery does not require that the perpetrator utilize the weapon in the perpetration of the robbery. . . . Similarly, the perpetrator need not display the weapon or otherwise make the victim aware of its presence." Commonwealth v. Rogers, 945 N.E.2d 295, 301 n.6 (Mass. 2011); see also King v. MacEachern, 665 F.3d 247, 253 & n.7 (1st Cir. 2011) (recognizing this point and collecting cases establishing it); Commonwealth v. Nickologines, 76 N.E.2d 649, 651 (Mass. 1948) ("It is not necessary to show the use of a dangerous weapon in proving the offence of robbery while armed. The gist of the offence is being armed, not the use of the weapon.").[13]

---

[13] Between Nickologines and Rogers, at least one SJC opinion contained language that could be read to signal a departure from this rule. See Commonwealth v. Appleby, 402 N.E.2d 1051, 1057 (Mass. 1980) ("The gist of the offense of armed robbery is robbery 'while armed,' and thus there is no need to prove the defendant used a weapon other than to threaten."). Nevertheless, the government has conceded that Rogers correctly states the Massachusetts law of armed robbery as it applied to Starks. The government makes no argument that the law differed in 1991, 1996, or 1998, the years of Starks's convictions.

The government concedes that armed robbery is not divisible. We accept this concession and do not decide the issue.[14] Accordingly, armed robbery qualifies as a predicate offense under the ACCA only if both ways of committing it are violent felonies.

We focus once again on the actual-force form of armed robbery. Starks argues that this form of armed robbery is not a violent felony because it requires no more force than the actual-force form of unarmed robbery. The only difference between the two crimes is that a defendant convicted of armed robbery must

---

[14] This concession, too, stands unrejected by the case law. Indeed, there is Massachusetts case law holding that a jury need not be unanimous about whether armed robbery was committed by force or by threat of force. In Commonwealth v. Santos, the SJC held:

> There was no requirement that the jury agree as to precisely which threat, or which application of force, caused the victim to part with her money, and it would thus be pointless to require them to agree that it was one or more of the threats as opposed to one or more of the applications of force that succeeded in convincing [the victim] not to resist the taking. The jury need not be unanimous as to that detail . . . .

797 N.E.2d 1191, 1196 (Mass. 2003), overruled in part on other grounds by Anderson, 963 N.E.2d at 718–19; see also Commonwealth v. Porro, 939 N.E.2d 1157, 1165 (Mass. 2010) (reaffirming Santos in dicta and stating that "we do not require that a jury be unanimous as to which theory of assault forms the basis for their verdict"). All of Starks's convictions for armed robbery occurred before the SJC issued the Santos decision. Adopting the historical approach required by Faust, 853 F.3d at 57, we would have to determine the state of the law before Santos. While the Massachusetts Appeals Court's opinion in Jones II, 426 N.E.2d at 727, noted above, may apply to armed robbery and may inform such an analysis, we need not and do not decide that here.

- 28 -

possess a weapon during the robbery, though the victim need not be aware of it. So, a person who has a knife in his pocket as he snatches a victim's purse is guilty of armed robbery in Massachusetts, even if the knife is not used or displayed during the robbery. Pointing to the minimal force requirement and the lack of any requirement that the victim even be aware of the weapon, the Ninth Circuit recently held that Massachusetts armed robbery is not a violent felony under the force clause. See United States v. Parnell, 818 F.3d 974, 979-82 (9th Cir. 2016); id. at 982 (Watford, J., concurring).

This argument can only succeed if Jones I applies to armed robbery. We note that there is a difference in the wording of the unarmed robbery and armed robbery statutes. Unarmed robbery requires that the defendant "by force and violence, or by assault and putting in fear, robs, steals, or takes from the person of another," Mass. Gen. Laws ch. 265, § 19(b), while armed robbery requires that the defendant "assaults another and robs, steals, or takes" the person's property, id. § 17. Nevertheless, the Massachusetts cases on robbery do not differentiate between the assault element of armed robbery and the force element of unarmed robbery. See, e.g., Commonwealth v. Santos, 797 N.E.2d 1191, 1196 (Mass. 2003) (describing the assault element of armed robbery as requiring either a "threat" or an "application of force"), overruled in part on other grounds by Anderson, 963 N.E.2d at 718-

- 29 -

19; Commonwealth v. Tarrant, 326 N.E.2d 710, 713 (Mass. 1975) ("The offense of robbery while armed is but an aggravated form of common law robbery and is to be distinguished in main by the manner of punishment and not by the material elements composing the common law crime of robbery."); Commonwealth v. Richards, 293 N.E.2d 854, 857 (Mass. 1973) (stating that both unarmed robbery and armed robbery can be committed in two ways:  "by force applied to the person, with intent to steal, or by an assault putting the person in fear, with the same intent"); Commonwealth v. Novicki, 87 N.E.2d 1, 3 (Mass. 1949) (similar).  Indeed, in a recent case describing the force requirement of armed robbery, the SJC quoted the statement in Jones I that "the degree of force is immaterial so long as it is sufficient to obtain the victim's property against his will."  See Commonwealth v. Joyner, 4 N.E.3d 282, 293 (Mass. 2014) (quoting Jones I, 283 N.E.2d at 843).

Thus, we conclude that there is no reason, in principle, that a purse-snatcher with a knife in his or her pocket could not be convicted of armed robbery.  Notably, the government does not argue otherwise.  Nor does the government argue that there is no reasonable probability that such a person would be charged with armed robbery.  Instead, the government recognizes that "because the dangerous weapon required to commit an armed robbery need not be used or shown during the offense, the analysis of the two crimes (armed and unarmed robbery) [is] substantially similar for

- 30 -

purposes of the force clause under the ACCA." (citation omitted). The government makes two primary arguments that armed robbery nevertheless satisfies the force clause.

First, the government argues that both unarmed robbery and armed robbery satisfy the force clause because the SJC's observations about the threat implicit in robbery entail that all forms of robbery satisfy the force clause. We have rejected this argument as to unarmed robbery above and we reject it as to armed robbery too. It is true that when a robber has a dangerous weapon, the risk of violence is greater and the SJC's observations about the threat implicit in robbery are even more apt. But the SJC did not make the threatened use of force a required element of armed robbery. Thus, even on the SJC's assumption that armed robbery generally involves an implicit threat of force, such a threat is not present in the least serious conduct for which there is a realistic possibility of a charge and conviction for Massachusetts armed robbery. Moreover, to deem an offense qualifying under the ACCA because the offense involves a risk of serious injury is to rely on the ACCA's residual clause, which was designed to capture crimes that "involve[] conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). That clause, though, no longer applies. See Johnson II, 135 S. Ct. at 2557. Nor is the fact that the residual clause has been invalidated a reason to read a risk evaluation into the analysis

of the force clause--indeed, it is a reason not to do so.  Such a reading could potentially render the force clause itself susceptible to a vagueness challenge.

Second, the government argues that we are bound to agree that armed robbery is a violent felony by our opinion in Luna.  In Luna, this court did hold that Massachusetts armed robbery was a violent felony under the force clause.  649 F.3d at 107-09. Intervening decisions by the Supreme Court have not cast doubt on this decision.  The Luna opinion issued after the Johnson I decision, addressed whether the crime of armed robbery in Massachusetts involves violent force, and it concluded that it does.  Id.  Luna did not rely on the residual clause, so Johnson II did not undermine it.  Nothing in Luna suggests that the panel applied the modified categorical approach to an indivisible statute, the error identified in Descamps, 133 S. Ct. at 2283, and Mathis, 136 S. Ct. at 2250–51.  Indeed, the Luna panel explicitly stated that both forms of armed robbery satisfied the force clause. See 649 F.3d at 108 n.18.

Nevertheless, Luna did not address the precise issue before this panel.  The defendant in that case did not make, and therefore waived, the argument that Starks now presses.  Instead, the defendant in Luna argued that the elements of armed robbery could be satisfied "if a defendant, while armed, puts his victim in fear using threatening words or gestures," and that therefore

- 32 -

"the crime does not require violent force." Id. at 108. This court, understandably, rejected that argument on the ground that an armed robbery involving only threatening words or gestures satisfies the force clause because it has as an element the threatened use of physical force. Id. Luna therefore only meaningfully considered a single argument relating to the constructive-force form of armed robbery.

We recognize that the Luna opinion's conclusion is phrased in broad terms. A footnote states that both forms of armed robbery "are proper ACCA predicates, as discussed below," id. at 108 n.18, though the opinion contains no further discussion of the actual-force form of armed robbery. The discussion of the force clause ends with: "Luna has also provided no reason for us to conclude that the type of force involved in armed robbery is not 'violent force--that is, force capable of causing physical pain or injury,' and we see no reason to do so." Id. at 108-09 (emphasis added) (quoting Johnson I, 559 U.S. at 140). The underlined clause may be read to imply that the court independently considered other arguments that armed robbery does not satisfy the force clause, which Luna had failed to raise.[15]

---

[15] We note, however, that Luna does not cite the SJC's opinion in Jones I. Nor does it recognize that to satisfy the force element of robbery in Massachusetts, "the degree of force is immaterial so long as it is sufficient to obtain the victim's property 'against his will.'" Jones I, 283 N.E.2d at 843 (quoting Mass. Gen. Laws ch. 277, § 39).

We conclude that this expansive language from Luna is dicta. It was presented without analysis and, because it addressed a broader argument about whether armed robbery qualifies as a violent felony that the defendant had waived, it was not necessary to the court's conclusion. We are not bound to follow it. See Arcam Pharm. Corp. v. Faría, 513 F.3d 1, 3 (1st Cir. 2007) ("We have held that 'when a statement in a judicial decision is essential to the result reached in the case, it becomes part of the court's holding.' The result, along with those portions of the opinion necessary to the result, are binding, whereas dicta is not." (quoting Rossiter v. Potter, 357 F.3d 26, 31 (1st Cir. 2004))); Dedham Water Co. v. Cumberland Farms Dairy, Inc., 972 F.2d 453, 459 (1st Cir. 1992) (similar); McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 19 (1st Cir. 1991) (similar).[16]

Our decision in United States v. Whindleton also does not require us to conclude that armed robbery satisfies the force clause. We cannot draw the same distinction between Massachusetts unarmed robbery and armed robbery that we drew between

---

[16] Following the procedure described in cases such as United States v. Holloway, 630 F.3d 252, 255 n.2 (1st Cir. 2011) and United States v. Gendron, 18 F.3d 955, 967 (1st Cir. 1994), the panel opinion in this case was circulated to all active judges of the court, none of whom objected to our treatment of Luna. "We caution that the use of this informal procedure does not convert this opinion into an opinion en banc, nor does it preclude a suggestion of rehearing en banc on any issue in the case . . . ." Holloway, 630 F.3d at 255 n.2.

Massachusetts assault and assault with a dangerous weapon (ADW) when we concluded in Whindleton that ADW necessarily involves violent force even though assault does not. See 797 F.3d at 111-16; see also United States v. Hudson, 823 F.3d 11, 17 (1st Cir. 2016) (holding that under the ACCA, Massachusetts ADW necessarily involves the use of violent force). In Whindleton, "[i]t [wa]s critical that the statute at issue . . . [wa]s Assault with a Dangerous Weapon" because,

> [l]ogically, the harm threatened by an assault is far more violent than offensive touching when committed with a weapon that is designed to produce or used in a way that is capable of producing serious bodily harm or death. As a result, the element of a dangerous weapon imports the 'violent force' required by [Johnson I] into the otherwise overbroad simple assault statute.

Whindleton, 797 F.3d at 113-14. Similar reasoning does not apply here because armed robbery, unlike ADW, does not require the use of the dangerous weapon. Thus, we cannot find, as we did in Whindleton, that armed robbery requires any sort of "touching . . . committed with a weapon that is designed to produce or used in a way that is capable of producing serious bodily harm or death." Id. at 114. In the absence of this factor, we see no basis for concluding that armed robbery requires a greater degree of force than unarmed robbery.

**4.**

Once again, the immensely complicated analysis required by the categorical approach for measuring state crimes against the standards set forth in the ACCA (or similar statutes) leads to a conclusion that a conviction for a violent sounding, serious crime is nevertheless not a violent felony (or a crime of violence or the like). One might reasonably guess that, in fact, Starks likely engaged in conduct that involved the use or threatened use of violent force against a person. Establishing a minimum term of incarceration based on the fact someone engaged in certain conduct, however, generally requires a jury finding. See Alleyne v. United States, 133 S. Ct. 2151, 2155 (2013). With the ACCA, Congress sought to avoid the need for such findings by mandating a longer sentence based not on conduct, but on bare convictions. While this works in principle, id. at 2160 n.1 (citing Almendarez–Torres v. United States, 523 U.S. 224 (1998)), its use requires that we deem the convictions to have been for the least serious conduct for which there is a realistic possibility of a charge and conviction. Thus, if a crime involves a taking of $1 to $1000, we must assume that a conviction was for taking $1. Similarly, in this case, we assume that Starks's many convictions were based on the least amount of force required by the pertinent laws and hold that that small level of force (i.e., touching) is not the violent force that the ACCA requires. We therefore reverse the district

court's ruling that the ACCA's 180-month mandatory minimum sentence applied.

## III.

For the foregoing reasons, we <u>affirm</u> Starks's conviction but <u>vacate</u> his sentence and <u>remand</u> for resentencing.